ORIGINAL BR

FILED

J.N

JAN X 9 2008
JAN 9 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

Garry Meier,                           )
                                       )
                    Plaintiff,         )
                                       )
          v.                           )
                                       )
TODD W. MUSBURGER, individually,)
and d/b/a as a non-existent            )
entity known as "Law Offices of )
of Todd W. Musburger, Ltd.",           )
TODD W. MUSBURGER, LTD., an            )
Illinois Corporation, and              )
BRIAN MUSBURGER,                       )
                                       )
                    Defendants.  )

08CV 216
JUDGE DER-YEGHIAYAN
MAGISTRATE JUDGE COLE

TRIAL BY JURY DEMANDED

## COMPLAINT

NOW COMES the Plaintiff, **GARRY MEIER** and complains of the Defendants, **TODD W. MUSBURGER**, individually, and d/b/a as a non-existent entity known as "Law Offices of Todd W. Musburger, Ltd.", **TODD W. MUSBURGER, LTD.**, an Illinois Corporation, and **BRIAN MUSBURGER**, alleging as follows:

### Nature of the Action

1.    Plaintiff brings these actions against the Defendants to recover damages, equitable, and other relief under the Racketeer Influenced and Corrupt Organizations Act ["RICO"] - 18 U.S.C. § 1961 et. seq., and Illinois statutory and common law.

### Jurisdiction

2.    This Court has original jurisdiction of Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 18 U.S.C. § 1961, et. seq. The Court has jurisdiction of Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

### Venue

3.    That venue in the Eastern District of Illinois, Eastern Division is proper pursuant to 28 U.S.C. § 1391(a) in

that Plaintiff's claims arose within this District out of a wrongful conduct herein complained of that occurred in the County of Cook, State of Illinois, as is hereinafter more particularly alleged Plaintiffs and all of the Defendants reside and/or do business within this District.

<u>Parties</u>

4.    That at all times relevant, Plaintiff GARRY MEIER (hereinafter referred to as "MEIER"), was a resident of the City of Chicago, County of Cook, State of Illinois and engaged in the occupation of and was a popular and award-winning on-air Radio Talk Show performing artist in the Chicagoland entertainment industry, and co-hosted an afternoon radio program known as the "Roe and Garry" Show with Roe Conn ("Conn") on WLS-AM radio ("WLS") in Chicago, Illinois until January 9, 2004, after which, 2007 he became the host of his own show on CBS's WCKG-FM radio known as The Garry Meier Show.

5.    That at all times relevant Law offices of TODD W. MUSBURGER, LTD. ("LOTWML") was a non-existent entity.

6.    That, on information and belief, TODD W. MUSBURGER (hereinafter referred to as "MUSBURGER") was, at all relevant times, a resident of Evanston, Illinois, an attorney licensed to practice law in the State of Illinois, and was, at all relevant times, the principal of MUSBURGER, LTD. and, along with it did business as LOTWML without disclosing that his son, BRIAN MUSBURGER (hereinafter referred to as "BRIAN"), was unlicensed as either an attorney and that neither he nor BRIAN, nor MUSBURGER, LTD. were licensed employment agents.

7.    That, on information and belief, BRIAN MUSBURGER is a resident of Cook County, Illinois, the son of MUSBURGER, and affiliated and associated himself with MUSBURGER individually and he and, MUSBURGER, LTD. d/b/a LOTWML in connection with the

2

representation and procurement of employment for MEIER and MUSBURGER'S other law and entertainment clients without disclosing that he was unlicensed as either an attorney or an employment agent.

8.    That, on information and belief, TODD W. MUSBURGER, LTD. ("MUSBURGER, LTD.") is an Illinois corporation. MUSBURGER, LTD., MUSBURGER and BRIAN have done business as LOTML without with having been duly incorporated, licensed, or having ever filed for or obtained any assumed name certificate to use the corporate name LOTWML. MUSBURGER, LTD., MUSBURGER and BRIAN have held themselves out under the name LOTWML to be operating as an "entertainment law firm" that focuses on negotiating and drafting personal services contracts for broadcasters, writers, performers and directors. Though, as hereinafter more fully specified, MUSBURGER, LTD. were unlicensed to procure employment in this or any state, they have regularly represented and held themselves out to be a talent and employment procurement agency and MUSBURGER and BRIAN have held themselves to be a talent and employment procurement agents.

<u>Facts Common to All Counts</u>

9.    That for many years prior to 1998 MUSBURGER and MUSBURGER, LTD., (hereinafter sometimes jointly referred to as "MUSBURGER") represented MEIER as his attorney and talent agent, in connection with procuring his employment for which MEIER paid large sums of money based on a percentage commission of his annual income.

10.    That, in or about January 1998, while employed as an on-air radio personality at WLS-AM radio in Chicago, MEIER retained Musburger's services as MEIER's agent and attorney in connection with negotiating a renewal of MEIER's agreement with

WLS. MEIER's agreement with WLS was to expire on February 18, 1999.

11. That, the terms and conditions of MEIER's retention of Musburger were set forth in a certain letter agreement dated February 6, 1998 (the "1998 Musburger Agreement").

12. That, under the 1998 Musburger Agreement, Musburger agreed to serve as MEIER's agent and exclusive legal representative for the negotiating and drafting of MEIER's agreements in the entertainment fields of radio and television, in exchange for a fee of five percent (5%) of the gross amount of any compensation payable to MEIER under each such agreement.

13. That, in or about February 1999, MEIER entered into an agreement (the "1999 WLS Agreement") covering his services with WLS for the period from February 1999 through February, 2004. MUSBURGER represented MEIER in the negotiation of the 1999 WLS Agreement.

14. That, on or about January 2003, TODD W. MUSBURGER, LTD. began work on MEIER's anticipated contract negotiations with WLS for a follow-on or renewal contract to the 1999 WLS Agreement, which was set to expire February 18, 2004.

15. Although MEIER and Conn co-hosted the same afternoon radio show on WLS at all relevant times prior to January of 2004, they had separate contracts with WLS, and were represented, in their dealings with WLS, by separate agents. At all relevant times prior to September 22, 2003, MEIER was represented by Musburger, while Conn was represented by George Hiltzik of N. S. Bienstock, in New York City.

16. That, based on their experience in the negotiation of the 1999 WLS Agreement, MEIER and Musburger were aware that they were more likely to achieve the results they sought from WLS if they could present a unified front with Conn. They were also

aware that WLS might elect to pursue a strategy of "divide and conquer" with respect to MEIER and Conn. Accordingly, at the end of May, 2003, while negotiations between MEIER and WLS for a follow-up contract to the 1999 WLS Agreement were still pending, MEIER directed Musburger to propose an agreement to Conn pursuant to which neither MEIER nor Conn would enter into an employment contract with WLS without the other's agreement.

17.  That pursuant to a draft of the proposed agreement between MEIER and Conn which Musburger drafted and sent to Conn's agent, George Hiltzik, for his approval and review, pursuant to MEIER's direction.

17.  That MEIER is informed and believes that on or about May 29, 2003, Musburger did, in fact, send the document attached as Exhibit B hereto to Conn, through his agent, George Hiltzik, for his approval and Conn's signature.

18.  That, on a number of occasions between the end of May, 2003 and his discharge by MEIER on September 22, 2003, Musburger represented to MEIER that the agreement with Conn had been "taken care of" or words to that effect, indicating to MEIER that Conn had signed the agreement.

19.  That, Conn never signed the proposed agreement.

20.  That, on or about August 6, 2003, TODD W. MUSBURGER, LTD. received a written proposal (the "August Proposal") from WLS for a contract renewal for MEIER.

21.  That MEIER and Musburger concurred that the August Proposal was unacceptable for a number of reasons.

22.  That shortly after having received the August Proposal, MEIER and Musburger agreed that their negotiation strategy with WLS would include an absence of contact with Zemira Jones, the President and General Manager of WLS for the time being.

23. That, at all relevant times prior to September 10, 2003, this strategy of avoiding contact with Zemira Jones concerning MEIER's renewal remained in effect.

24. That, on September 4, 2003, TODD W. MUSBURGER, LTD. sent a new fee agreement to Defendant which contained several new provisions, including the following language:

(a) We may render similar services to others, including persons of the same general qualifications and eligibility for similar employment, and such representation shall not constitute a violation of our fiduciary or other obligations hereunder.

25. That MEIER refused to sign the proposed letter agreement that Musburger sent to MEIER on September 4, 2003.

26. That, on September 10, 2003, MEIER left the following voice mail via the wires message with Musburger:

"Todd this is Garry, hey listen I've been thinking about this and I want to put everything on hold right now. I want you to take the next week and me take the next week, I want to think about all this and how I want to proceed with everything, so I don't want you to meet with anyone or have any further conversations with anyone until I can thoroughly think this through, so if you have anything scheduled with anyone regarding the future contract, I'd like you to cancel that until after next week, you can tell them you have a scheduling conflict, and then I'd like to schedule a time for us to talk on the 23rd after I'd had a time to process this, I haven't discussed this with Roe so I'd appreciate you handling this request with that in mind. You can email Cynthia on the 23rd when you're available to talk. Alright, thanks."

27. That Exhibit D submitted herewith is a true and exact transcript of the voicemail that MEIER left with Musburger on September 10, 2003.

28.  That, later on September 10, 2003, Cynthia Fircak sent to Musburger the following e-mail on behalf of MEIER:

> "Garry asked me to e-mail you to confirm a message that he left today on your voicemail. I am writing this from his notes to be absolutely clear.
>
> "He wants to take the next week and think about how he wants to proceed with everything. He doesn't want you to meet with anyone or have any further conversations with anyone until he can thoroughly think this through.
>
> "If you have anything scheduled with anyone regarding the future contract, he would like you to cancel that, until after next week, by saying that there is a problem with your schedule or whatever may allow him this time.
>
> "He would like to schedule a time to talk with you the following week—perhaps Tuesday the 23rd in the morning—after he has had time to process this.
>
> "He hasn't discussed this with Roe so he would appreciate you handling this request with that in mind.
>
> "Please let me know if you are available to talk on the 23rd."

29.  That, on September 11, 2003, Musburger sent to MEIER and Fircak, by messenger, two letters, the first of which stated as follows:

> "As you know, we had a previously scheduled meeting today with Zemira and Mike Packer. It is evident that ABC is poised to finalize an agreement with us in the financial range that Garry is seeking. This would take the program to the highest level ever reached in Chicago radio.
>
> "Again, I do not favor the two-week delay you are seeking. If you wish to talk on the 23rd, I will be pleased to see you. Please let me know what time is best. In the

meantime, please be assured that if I am involved in any conversations concerning Garry's future, I will do only what is best to advance his interests. Also, please know that I am available at your convenience any time prior to the 23rd."

30.    That Exhibit F attached hereto is a true and exact copy of the first letter Musburger sent to MEIER and Fircak, by messenger on September 11, 2003.

22.    That, on September 11, 2003, after sending to MEIER and Fircak the letter attached hereto as Exhibit F, Musburger sent to MEIER and Fircak, by messenger, a second letter stating the following:

> "I have received your message that you would like me to speak with you on September 23rd to arrange a meeting.

> "I am mystified as to the reasons for the delay. As you know, I feel we are in a sensitive time-period where we are nearing a conclusion, and a new deal for you, Garry, whether it is with ABC or one of the interested competitors. As we discussed last week Cynthia, the list is growing smaller and the likelihood of a renewal with ABC is strengthening. I am concerned that any delay in the process is antithetical to your best interests.

> "Your avoidance of a personal conversation makes it appear that you are considering terminating our professional relationship. I would be extremely disappointed if that is so, both because I value my association with each of you, but also because of the enormous efforts that we have expended on your behalf. The energy put into this negotiation, which has involved multi-party interest in your show, balancing the restrictions in your present agreement, and finessing the always-difficult ABC management team is no small task. We have met these challenges head on and I can say unequivocally that the work for you has been performed with the highest degree of attention

8

and professionalism, both with WLS and the competition. We have also eagerly advanced the interests of your on-air partnership wherever we could. I am very satisfied with and proud of the work that has been completed to date. We are on the eve of a resolution within your parameters Garry, leading to an agreement which you could fully endorse. You possess a strong bargaining position but the methods employed on your behalf will make the difference between the deal you want and a routine renewal. I feel equal to the task of successfully closing this matter and believe my previous work for you serves as an example of my ability to do so.

"Nevertheless, should you decided to make a change I will of course honor your decision. If you so decide, which again I would find regrettable, all that would be required is for the work that has been completed, including the final steps that have been prepared, to be properly and fully compensated. These amounts are in addition to what is owed for our work under your present ABC agreement. Obviously, this is something you should discuss in detail with a new representative, if one is hired. For many reasons, I hope sincerely that we are not confronted with such a scenario.

"I am sorry that you feel the meetings and conversations that I have scheduled should not be pursued at this time. Unfortunately, I have other business with Zemira Jones scheduled for today. Although I cannot reschedule, I will inform him of your wishes. We are also active with each of the other interested competitors on your list and my other matters with them cannot be interrupted. However, we will tell them that we need more time in which to discuss your situation. I fear that when I inform them of your decision, they will misunderstand and misinterpret our goals. This could lead to a diminution of interest and negatively affect the negotiating process. George Hiltzik also needs to be completely informed. I am certain that you agree with me that these are but a few of the numerous factors which should keep us from delaying conversations on your behalf.

"I hope we can talk soon. You have made it clear
through your choice of email and voice mail that you
do not want to talk directly to me at this time. I am
disappointed by this but will continue to respect your
wishes."

31.   That, on September 11, 2003, Musburger and his son,

Brian Musburger, met with Zemira Jones, President and General

Manager, of WLS, and Mike Packer, Operations Director of WLS, at

Volari Restaurant in Chicago, Illinois. This meeting had been

initiated by MUSBURGER.

32.   That, at the September 11, 2003 meeting at Volari

Restaurant, Musburger did not disclose to Jones and Packer that

MEIER had instructed him, only the day before, not to meet with

Jones and Packer to discuss MEIER's future employment with WLS.

Instead, he told Jones and Packer that something very wrong was

going on internally, and he, MUSBURGER, was in trouble with

MEIER.

33.   That, at the September 11, 2003 meeting at Volari

Restaurant, Musburger discussed the terms of a potential deal

for MEIER's future services with WLS with Jones and Packer,

including the base compensation to be paid to MEIER, the bonus

to be paid to MEIER, the length of the deal, whether the deal

was to include one or more cycles, and the other terms and

conditions of MEIER's prospective employment with WLS.

34.   That, on September 12, 2003, MEIER sent to Musburger

the following letter:

10

"When I returned home yesterday evening, I received your letter which was sent via messenger to Cynthia and myself. Given its tone and content, I wanted to promptly respond.

"You indicate in your letter that our avoidance of a personal conversation makes it appear that I am considering terminating our professional relationship. Neither Cynthia nor I have avoided a personal conversation with you. What has happened is this. During our last telephone discussion you mentioned that you were sending an updated fee agreement. When Cynthia asked if you wanted to talk about it you declined. This written agreement was dated September 4, 2003 and Friday, September 5th and both Cynthia and I immediately called you to express our disappointment with both the document and the manner in which it was handled. Neither of us was able to speak with you personally and left voice mail messages. You called over the weekend, while we were out, and left a message of your own, recognizing that we were upset and suggested that we speak on Monday. Cynthia then sent you an email indicating that Monday was not good for her, acknowledging that she knew you were in New York on Tuesday and Wednesday, and asked if instead, we could schedule some time to talk on Thursday or Friday. That same morning you called me and left a message that you would use the "old agreement between us.""

In response to that suggestion of yours, I called you early Wednesday morning and left my voice mail message, explaining that I wanted to take next week and just think about how I wanted to proceed with everything. I told you that in the interim, I didn't want you to meet with anyone or have any further conversations with anyone and that if you had anything scheduled regarding my future contract, that I wanted you to cancel until we could reconnect. I thought it was important that Cynthia and I discuss with you, our view of what a new fee agreement should be rather than simply signing one which you sent to me without any prior discussion. Frankly, I think this really should have occurred earlier this year, rather than during this "sensitive time period" as you described it in your letter. Delaying having brought this matter to my attention until this point in time places me in the

disadvantageous position of having to have to negotiate both with you, and also with ABC and the others. So, with this backdrop. Can you really be "mystified" as you wrote in your letter, as to the reasons for me wanting to take some time to consider my future?

"I also think that you would have to agree that I was hardly avoiding personal conversation with you when I asked you in my voice mail to please email Cynthia with what time you would be available to meet with us on September 23rd. You failed to sent Cynthia an email responding to this request and your letter was silent concerning it.

"I must say that I find it disturbing that you indicated in your letter that you planned on informing Zemira Jones of my "wishes." When last we had spoken substantively concerning this negotiations, we had decided that we were wasting our time with Zemira, given his current unfavorable posture, and that we were to avoid contact with him for the time being. In any event, your having contact with Zemira only undermines that negotiating strategy and disclosing my "wishes" is both contradictory to my expectation of confidentiality and inconsistent with my instructions to you in my voice mail message, that you should simply give anyone with whom you have made an appointment, an excuse relative to scheduling conflicts.

"Finally, I was surprised that you viewed my interest in taking some time to consider matters to be the equivalent of choosing to terminate your services and that you believe I am required to "property and fully" compensate you for the work that has been performed to date. I was unaware that you were entitled to any compensation in addition to that which you have been receiving, for the work which you have done to date. To the extent that you believe you have such a right to compensation, and I don't agree that you do, please (a) explain in writing the basis for that position, (b) provide me with detailed and itemized records of time expended on my behalf with descriptions fo the work performed and (c) the amount claimed to be due. Kindly provide all of this to me sufficiently prior to our meeting on September 23rd so that I can carefully

review it, if you are in fact able to meet with us on that date. At that time, we can discuss any remaining issues raised in your letter and the future of our professional relationship.

"Once again, I am requesting that you refrain from meeting with or engaging in conversations with any of the parties involved with ABC or the interested competitors concerning my interests; that includes George Hiltzik [the agent for Roe Conn]. To the extent that contact is inadvertent or unavoidable, please inform the party that you are present that day to discuss only your other client's affairs and not mine.

"Cynthia is familiar with my schedule for the 23rd and looks forward to hearing from you regarding a specific time when we can meet that day."

35.   That, on September 13, 2003, Cynthia Fircak sent Musburger the following e-mail:

"We received your second letter dated September 11th and Garry and I remain very concerned that you appear to be insisting on continuing to engage in discussions regarding Garry's future, on the basis that you are "doing what is best to advance his interests," rather than following his clear and unequivocal direction to you not to meet with anyone or have any further discussions concerning them until after our meeting on the 23rd. Garry made clear his position concerning this in both his September 10th voice mail and his September 11th letter to you, which was delivered to our office yesterday morning.

"You stated that ABC is "poised" to meet Garry's number. I can only assume, given the history of our involvement with Zemira, that you have those numbers in writing from ABC. Otherwise, I am hard pressed to believe that you could, in good faith, use the word "poised" in relationship to their current position, given that you yourself have said that you can't take Zemira's word for anything. Indeed, the last offer from him was truly insulting.

"Therefore, if those numbers are in hand, please forward them to Garry and me immediately. If you do

not have anything in writing from Zemira, Garry does not want you to now contact him, in light of our earlier requests. Also, please provide us with an e-mail setting forth in detail what occurred when you spoke with Zemira and Mike Packer on Thursday, including any representations which were made as to a specific dollar amount.

"Garry and I are available to talk with you at 9:00 a.m. on September 23rd.".

36.    That on September 15, 2003, MEIER sent Musburger the following letter, to which a copy of Cynthia Fircak's September 13, 2003 e-mail was attached:

"Attached you will find a copy of an email that was sent to you on Saturday, September 13th, at my request, by Cynthia. Please respond to this request immediately.

37.    That, on information and belief, MUSBURGER had two telephone conversations on September 16, 2003 between Musburger and George Hiltzik, the agent for Roe Conn, each of which is described as lasting half an hour.

38.    That, on information and belief, MUSBURGER on information and belief in month of September 2003, had two telephone phone conversations on September 16, 2003, each of .5 hours' length, with George Hiltzik.

39.    That, on information and belief, MUSBURGER also had phone conversations telephone conversation on September 16, 2003 between Musburger and Zemira Jones that may have lasted a full hour.

14

40.  That, on information and belief, MUSBURGER had two telephone conversations on September 17, 2003 with George Hiltzik, the agent for Roe Conn, each of which is described as lasting half an hour.

41.  That, on information and belief, phone conversations maintained by On September 18, 2003, Musburger and his son, Brian Musburger, met with Zemira Jones and Mike Packer at Sears Tower.

42.  That the September 18, 2003 meeting between Musburger, Brian Musburger, Jones and Packer was initiated by Musburger as an "emergency" meeting.

43.  That Musburger did not advise Jones or Packer, at any time prior to the September 18, 2003 meeting, that MEIER had directed him not to meet with Jones, Packer or any other WLS representative to discuss the terms or conditions of MEIER's future employment at WLS.

44.  That Musburger did not advise MEIER or Cynthia Fircak that he was meeting with Jones and Packer on September 18, 2003.

45.  That, at the September 18th meeting, Musburger did discuss with Jones and Packer the terms and conditions of MEIER's future employment with WLS.

46.  That at no time prior to September 22, 2003 did Musburger respond to the request that MEIER made in his letter of September 12, 2003 that Musburger (a) explain in writing the

15

basis for his position that he was entitled to compensation for the work he was performing in addition to the monies he was already receiving from MEIER, (b) provide MEIER with a detailed and itemized records of time expended on MEIER's behalf with descriptions of the work performed and (c) set forth the amount claimed to be due.

47. That, at no time prior to September 22, 2003 did Musburger respond to the demand set forth in Cynthia Fircak's e-mail of September 13, 2003 and reiterated in MEIER's letter of September 15, 2003, that Musburger provide MEIER with numbers from ABC verifying Musburger's claim that ABC was "poised" to meet Garry's number.

48. That, on September 22, 2003, MEIER sent to Musburger the following letter:

> "I've read your email from Friday advising that you were looking forward to our meeting Tuesday morning. I have been waiting for more than a week for you to provide us with an email setting forth in detail what occurred when you spoke with Zemira and Mike Packer on September 11[th]. We also requested that you provide us with whatever you had in writing from ABC which leads you to conclude that they were 'poised to finalize an agreement with us in the financial range" which I am seeking. We asked for this information 'immediately' and you have provided us with nothing — 9 days later. Your conduct is unacceptable.
>
> "I have tried to work with you and provide you with an opportunity to continue our professional relationship. Beginning as early as spring of this year, we spoke with you regarding your ongoing lack of availability and effectiveness. We let you know that these were problems and each time we spoke concerning

16

this, you assured us that things would change. You promised that things would move in a more positive direction, yet they never did.

"Despite our repeated requests, you have persisted in failing to consistently provide us with documentation of meetings. In the very beginning of September, I had asked that you write Zemira a letter following a meeting; you failed to do so. At a time when you should have been totally focused on my business interests, your focus instead was preparing and sending me a new agreement for your fees, which also would have required me to have permitted you to have conflicts of interest. Your failure to send Zemira the letter I requested put me at a disadvantage when Zemira called me into his office and characterized the state of the negotiations in a manner in which he couldn't have done, had the letter been sent as requested.

"My September 12th letter and our September 13th email set forth other instances of you refusing to respect my requests and instructions. Particularly, in my September 12th letter which was hand delivered to you that morning, I repeated my direction to you that pending our meeting on the 23[rd], you were to refrain from meeting with or engaging in conversations with any of the parties involved in the negotiations, including George Hiltzik. I named him specifically. Not only did you thereafter speak with Mr. Hiltzik, contrary to my explicit instructions, your utterances as I understand them, were untruthful and violated both my attorney-client privilege, and other fiduciary duties which you owe me as a client.

"Under the circumstances, the meeting which I had hoped to have with you on the 23[rd] is now pointless and is canceled. I no longer have faith or trust in you as my attorney, representative or advisor and therefore am terminating your services under our letter agreement dated February 6, 1998. You must discontinue having contact with persons on my behalf and have no further conversations with anyone regarding my interests. Finally, I am also terminating immediately, any authority which you had under our February 6, 1998 agreement to incur expenses on my behalf in connection with your representation.

17

"Kindly provide me with any and all documents relating to your firm's representation of me within 48 hours. Pending your compliance with my request, without waiving any of my rights, I anticipate, that you will continue to receive payments under my current contract which expires February 19, 2004. I trust that you will keep Cynthia's and my discussions with you confidential as required by law.

"While I have no interest in initiating an adversarial relationship with you, I will not hesitate to act to enforce Cynthia's and my rights as my be necessary."

49.   That Musburger subsequently testified under oath that at the September 18, 2003 meeting, WLS orally communicated to Musburger the substance of an offer to retain MEIER's personal services for a period of ten (10) years, at an initial salary of $1.5 million to $1.6 million per year, with bonuses and a signing bonus.

50.   That at no time prior to or after September 22, 2003 did Musburger communicate to MEIER the substance of the terms which he testified in his deposition had been offered to him by WLS at the September 18, 2003 meeting at Sears Tower with Jones and Packer.

51.   That had MUSBURGER, LTD. and Musburger communicated the terms of the offer made at the September 18, 2003 meeting to MEIER, MEIER would have given it the utmost serious consideration, and would, in all likelihood, have accepted such an offer.

52.   That, subsequent to the termination of the services of MUSBURGER on September 22, 200, MEIER relied upon Cynthia Fircak

18

to negotiate with WLS and other broadcast entities for an agreement following the expiration of the 1999 WLS agreement.

53. That WLS did not present an offer having the numbers referenced in Musburger's deposition testimony to Ms. Fircak until late in the Spring of 2004, by which time the circumstances had changed drastically, MEIER had been taken off the air, and the attractiveness of such an offer to MEIER was substantially less than it would have been in September of 2003. As a result, MEIER was unable to effect a renewal of the WLS 1999 Agreement, and has been without employment since February 24, 2004.

54. That, subsequent to the termination of the services of MUSBURGER on September 22, 200, MEIER relied upon, Cynthia Fircak to negotiate with WLS and other broadcast entities for an agreement following the expiration of the 1999 WLS agreement.

55. That as of April 1, 2004, MEIER continued to be in sensitive and difficult contract negotiations with WLS, WGN and WSCR.

56. That on April 1, 2004, MUSBURGER filed a complaint against MEIER in the Circuit Court of Cook County seeking payment of legal fees claimed to have been incurred in connection with the negotiation of a broadcast agreement intended to be effective following the expiration of MEIER's 1999 WLS agreement.

19

57. That without MEIER's permission or seeking a protective order, MUSBURGER needlessly attached as Exhibit A to its Complaint, a complete copy of MEIER's 1999 WLS contract, thereby deliberately making public the financial terms and conditions of his recently expired broadcast agreement.

58. That said Exhibit A was a confidence and secret of MEIER's, the disclosure of which violated MEIER's attorney-client privilege and was prohibited from disclosure by Illinois Supreme Court Rules of Professional Conduct.

59. That the disclosure of Exhibit A was not necessary to establish or collect the fee sought by MUSBURGER.

60. That the filing of said Complaint and Exhibit A by MUSBURGER resulted in immediate widespread publicity in both the Chicago Tribune and Chicago Sun-Times newspapers.

61. That, upon information and belief, MUSBURGER, or its agents informed news media representatives of the filing of the complaint.

62. That the disclosures made in Exhibit A to the said Complaint were, on their face, private and not public facts.

63. That the disclosures made in Exhibit A to the Complaint were intended to, and did, have a disruptive effect upon MEIER's efforts to negotiate a new employment contract for himself with both WLS and with other radio stations.

20

64. That, in or about 2003, MEIER and TODD W. MUSBURGER, LTD. agreed that in addition to negotiating with WLS for a renewal of the agreement which would expire on February 18, 2004, TODD W. MUSBURGER, LTD. would pursue broadcasting opportunities for MEIER with WGN radio and WSCR radio in Chicago.

65. That, at all times relevant Dan Bernstein was an afternoon sports talk show host at WSCR.

66. That at all times relevant, MUSBURGER, LTD. represented Dan Bernstein in connection with his engagement with WSCR and his interests in other broadcast outlets.

67. That, beginning in 2003, and at all times material hereto with respect to WSCR, MUSBURGER, LTD.'s representation of Dan Bernstein was directly adverse to that of MEIER.

68. That at no time did MUSBURGER, LTD., MUSBURGER or BRIAN disclose to MEIER that it represented Dan Bernstein.

69. That at no time did M MUSBURGER, LTD., MUSBURGER or BRIAN attempt to obtain or obtain MEIER's consent to the representation of Dan Bernstein.

70. That MUSBURGER, LTD and Musburger did not reasonably believe that the representation of Dan Bernstein would not adversely affect the relationship with MEIER.

71.   That MUSBURGER, LTD.'s and Musburger's representation of MEIER was materially limited by TODD W. MUSBURGER, LTD.'s responsibilities to Dan Bernstein.

72.   That MUSBURGER, LTD.'s and Musburger's representation of MEIER was materially limited by TODD W. MUSBURGER, LTD.'s own financial interests attributable to maintaining Dan Bernstein at WSCR.

73.   That, on September 4, 2003, MUSBURGER, LTD. and Musburger sent a new fee agreement to MEIER which contained several new provisions, including the following language:

(a)   We may render similar services to others, including persons of the same general qualifications and eligibility for similar employment, and such representation shall not constitute a violation of our fiduciary or other obligations hereunder.

74.   That at the time MUSBURGER, LTD. and Musburger sent said new fee agreement, they failed to advise MEIER to obtain independent legal advice concerning said agreement, notwithstanding that MUSBURGER LTD. and Musburger owed already MEIER fiduciary duties and the timing of the proposed agreement was coercive in the context of the negotiations with WLS radio.

75.   That MEIER refused to sign said new fee agreement, and, on September 22, 2003, discharged MUSBURGER, LTD. and Musburger for cause.

76.   That after MEIER discharged MUSBURGER, LTD. and Musburger on September 22, 2003, MEIER relied upon, Cynthia

22

Fircak to negotiate with WLS and other broadcast entities for employment for MEIER to follow the expiration of the 1999 WLS agreement.

77. That, not understanding, due to MUSBURGER's nondisclosures and other wrongful conduct described herein, MUSBURGER was mistakenly paid over $20,000.00 in additional commissions by or on behalf of MEIER after discharging him for cause.

78. That as of April 2004, MEIER continued to be in sensitive and difficult contract negotiations with WLS, WGN and WSCR.

79. That in April and May of 2004, following his filing of the Complaint in this action and his public disclosure of MEIER's compensation from WLS under the 1999 Agreement, and at a time when MEIER was still engaged in negotiations with WLS for a renewal of his employment following the expiration of the 1999 WLS Agreement, Musburger approached WLS with the proposal that his client, Dan Bernstein, co-host the afternoon radio show formerly co-hosted by MEIER.

80. That at all relevant times while MUSBURGER, LTD. and Musburger were engaging in a conflicted representation of MEIER, MEIER was making payments to them, under the terms of the 1999 Musburger Agreement, equal to five percent (5%) of the compensation paid to him under the 1999 WLS Agreement.

81.  That by virtue of their breach of their fiduciary duties to MEIER, MUSBURGER, LTD. and Musburger have forfeited all claim to these payments, and should be required to disgorge them.

82.  That, additionally, by virtue of their breach of their fiduciary duties to and contract with MEIER, MUSBURGER, LTD. and Musburger have forfeited all claim to any commissions and/or compensation for services supposedly rendered to MEIER in their attempts to negotiate a renewal of the 1999 WLS Agreement and paid prior thereto and thereafter.

83.  That on January 23, 2004, MUSBURGER sent to MEIER a letter enclosing a copy of a Statement demanding payment for legal services supposedly rendered by MUSBURGER to MEIER in attempting to negotiate a renewal of the 1999 WLS Agreement.

84.  That the Statement, which was on the letterhead of the Law Offices of Todd W. Musburger, Ltd., provided in relevant part, as follows:

"FOR PROFESSIONAL SERVICES

"Period ending September 22, 2003:

| | |
|---|---|
| 170 hours @ $475.00 per hour | $80,750.00 |
| 40 hours @ $300.00 per hour | $12,000.00 |
| BALANCE DUE: | $92,750.00 |

85.  That neither the Statement nor the accompanying letter disclosed that the line reading "40 hours @ $300.00 per hour

24

$12,000.00" relates exclusively to services allegedly performed
for MEIER by BRIAN.

86. That at no point prior to the commencement of this
litigation did MUSBURGER disclose to MEIER that the line reading
"40 hours @ $300.00 per hour - $12,000.00" relates exclusively
to services allegedly performed for MEIER by BRIAN, and MEIER
did not learn of this fact until the depositions of Todd and
MEIER by BRIAN were taken in state litigation.

87. That BRIAN is not, and has never been, an attorney
licensed to practice law in the State of Illinois or any other
jurisdiction.

88. That the 1998 Musburger Agreement did not call for the
provision of services by BRIAN or anyone else, or for the
payment of same by MEIER.

89. That the 1998 Musburger Agreement was a personal
services contract calling for the performance by MUSBURGER of
all legal services contemplated therein.

90. That MEIER never entered into any separate agreement
with either MUSBURGER or with BRIAN calling for the payment by
MEIER of fees for work which BRIAN might perform for him, as an
associate or affiliate of MUSBURGER or otherwise.

92. That on one occasion, when MEIER and Cynthia Fircak
noted the presence of BRIAN at a meeting and asked MUSBURGER

what BRIAN was doing, there, MUSBURGER responded that BRIAN was just there to "learn the business."

93. That at no time did BRIAN perform substantial services for MEIER, and he did not actively participate in any negotiations between MUSBURGER and WLS or any other third party in connection with matters concerning MEIER.

94. That on January 23, 2004, MUSBURGER sent to MEIER a letter enclosing a copy of a Statement demanding payment for legal services supposedly rendered by MUSBURGER to MEIER in attempting to negotiate a renewal of the 1999 WLS Agreement.

95. That the Statement, which was on the letterhead of the non-existent entity, "LOTWML", provided in relevant part, as follows:

"FOR PROFESSIONAL SERVICES

"Period ending September 22, 2003:

| 170 hours @ $475.00 per hour | $80,750.00 |
| 40 hours @ $300.00 per hour | $12,000.00 |

BALANCE DUE:  $92,750.00

96. That through discovery in the state collection litigation, MEIER has ascertained that the line in the Statement reading "170 hours @ $475.00 per hour" was for services allegedly performed for MEIER by MUSBURGER, and that the line reading "40 hours @ $300.00 per hour $12,000.00" relates exclusively to services allegedly performed for MEIER by BRIAN.

97. That MEIER has since to paid MUSBURGER's counsel pursuant to a judgment presently on appeal in which he is challenging the existence of LOTWML, the additional sum of $74,598.68.

98. That the services for which LOTWML and charged and that were paid by MEIER or on his behalf over the time Defendants represented him where performed by MUSBURGER for the purpose of procuring or attempting to procure employment for MEIER either at WLS-AM or with another radio station.

99. That MEIER never entered into any separate agreement with either MUSBURGER or with BRIAN calling for the payment by MEIER of fees for work which BRIAN might perform for him, as an associate or affiliate of MUSBURGER or otherwise.

100. That, on one occasion, when MEIER noted the presence of BRIAN at a meeting and asked MUSBURGER what BRIAN was doing, there, MUSBURGER responded that BRIAN was just there to "learn the business."

101. At no time did BRIAN perform substantial services for MEIER, and he did not actively participate in any negotiations between MUSBURGER and WLS or any other third party in connection with matters concerning MEIER.

102. That all relevant times, MUSBURGER, LTD., MUSBURGER and BRIAN owed, and MEIER reasonably believed and expected protected by and right to rely fiduciary duties stemming from

the nature of the attorney-client and agency relationships as aforesaid.

103. That the fiduciary duties that MUSBURGER, LTD., MUSBURGER and BRIAN owed MEIER included, among other things, compliance by MUSBURGER, LTD. and MUSBURGER and BRIAN to the hereinafter-referenced provisions of the Illinois Supreme Court's Rules for Professional Responsibility governing the conduct of attorneys and Illinois Law regulating employment and talent agents.

104. That in asserting a separate and distinct claim against MEIER for the value of the services supposedly rendered by MUSBURGER, LTD., MUSBURGER and BRIAN violated their fiduciary duties to MEIER in one or more of the following respects:

a. There was never any understanding or agreement between the parties that BRIAN's services, if any, were to be compensated separately for any services rendered or to be rendered by him to MEIER;

b. Because BRIAN was not, at any relevant time, an attorney, the assertion of a separate claim for fees on his behalf was an exercise in fee-splitting between a lawyer (MUSBURGER) and a non-lawyer (BRIAN), which is expressly prohibited by Rule 5.4;

c. Todd never, at any time, disclosed to MEIER that it was his intent to bill MEIER separately for the services, if any, performed by BRIAN, a non-attorney, or to split with BRIAN, a non-attorney, any fees he might receive in connection with his representation of MEIER;

d. The Statement was drafted and presented in such a way as to conceal, rather than disclose, the fact that the claim made therein for "40 hours @ $300.00 per hour $12,000.00" relates exclusively to services allegedly performed for MEIER by

Brian, a non-attorney with whom MEIER had no separate contractual relationship;

    e.   To the extent that the Statement was intended to be a claim by Todd for the reasonable value of his services as an attorney in light of his discharge by MEIER, pursuant to the rule set forth in *Rhoades v. Norfolk & Western Railway Co.*, 78 Ill.2d 217, 399 N.E.2d 969 (1979), that rule did not extend to BRIAN, a non-attorney;

    f.   To the extent that the Statement was intended to be a claim by BRIAN for the reasonable value of his services (a claim not enunciated the Statement), BRIAN had no reasonable expectation of being paid for his services separate and apart from any fee agreement between MEIER and MUSBURGER.

    g.   BRIAN's services were not, under any circumstances, worth $300.00 per hour.

    105. That the claim for Brian's services which was worked (without clear enunciation or attribution) into the Statement was, in fact, nothing more than an effort to obtain money to which neither MUSBURGER, LTD., MUSBURGER nor BRIAN was entitled, in breach of Todd's fiduciary duties and through false and fraudulent pretenses.

    106. That, on information and belief, BRIAN conspired with and aided and abetted the attempt of MUSBURGER, LTD., MUSBURGER and BRIAN to obtain money from MEIER, through false and fraudulent pretenses and in breach of MUSBURGER, LTD., MUSBURGER and BRIAN's fiduciary duties, in one or more of the following respects.

    a.   Provided MUSBURGER with records of his time and activities regarding MEIER, knowing that he intended to utilize such records to make a claim for monies allegedly owned by MEIER

29

to BRIAN that was false, fraudulent, in violation by BRIAN of his fiduciary duties to MEIER, and without any basis; and

b.   Approved   the   Statement,   in   the   misleading   and deceptive form it was sent by MUSBURGER to MEIER, knowing that the claim for "40 hours @ $300.00 per hour   $12,000.00" related exclusively to services allegedly performed for MEIER by BRIAN, but that this was not disclosed in the Statement.

107. That by engaging in the conduct described in Paragraph 25, BRIAN knowingly and substantially assisted in MUSBURGER, LTD. and MUSBURGER's wrongful effort to obtain money from MEIER, by deceiving, cheating and defrauding him through false and fraudulent pretenses and in breach of MUSBURGER, LTD., MUSBURGER and BRIAN's fiduciary duties owed MEIER.

108. That because MUSBURGER, LTD., MUSBURGER and BRIAN, have continued to breach their fiduciary duties, MEIER has sustained actual damages in that he has been forced to retain counsel to represent him relating thereto.

<u>COUNT I</u>
(Racketeer Influenced and Corrupt Organizations
Act ["RICO"] - 18 U.S.C. § 1961 et. seq., Claim)

1-108. MEIER reallege paragraphs 1 through 108 of this Complaint as paragraphs 1 through 108 of this Count I as if set forth fully herein.

109. That there was, at all relevant times, in full force and effect, a statute, 225 ILCS 515.1 *et seq.*, commonly known as the Private Employment Agency Act (the "Act"), which reads, in pertinent part, as follows:

§ 1. It shall be the duty of the Department of Labor and it shall have power, jurisdiction and authority to issue licenses to employment agencies or agents . . . No person shall open, keep or carry on any employment agency in the State of Illinois, unless such person shall procure a license therefor from the Department of Labor. Any person who shall open up, or conduct any such agency without first procuring such license or without paying any fees required by this Act, shall be guilty    of    a    Class    B    misdemeanor.

*    *    *    *

Each applicant for a license shall file with the application a schedule of fees, charges and commissions, which he intends to charge and collect for his services, together with a copy of all forms and contracts to be used in the operation of the agency. Such schedule of fees, charges and commissions may thereafter be changed by filing with the Department of Labor an amended or supplemental schedule, showing such changes, at least 15 days before such change is to become effective. Any change in forms or contracts must be filed with the Department of Labor at least 15 days before such change is to become effective. Such schedule of fees to be charged shall be posted in a conspicuous place in each room of such agency where applicants are interviewed and such schedule of fees shall be printed in not less than 30 point bold faced-type. Agencies which deal exclusively with employer paid fees shall not be required to post said schedule of fees. The Department may by regulation require contracts to contain definitions of terms used in such contracts to e l i m i n a t e                  a m b i g u i t y .

It shall be unlawful for any employment agency to charge, collect or receive a greater compensation for any service performed by it than is specified in such schedule filed with the Department of Labor. It shall be unlawful for any employment agency to collect or attempt to collect any compensation for any service not specified in the schedule of fees filed with the department.

*    *    *    *

31

§ 4. It shall be unlawful for any person to act as an employment counsellor, or to advertise, or assume to act as an employment counsellor, without first obtaining a license as such employment counsellor, from the Department of Labor. It shall be unlawful for any person to engage in, operate or carry on the business of an employment agency unless each employee of such agency, who furnishes information to any person as to where employees or employment may be obtained or found, is a licensed employment counsellor. Where the license to conduct an employment agency is issued to a corporation and any officer of the corporation performs any function defined as those to be performed by an employment counsellor, he shall be considered an employee of the corporation and shall be required to secure a license as an employment counsellor.

* * * *

The term "employment agency" means any person engaged for gain or profit in the business of securing or attempting to secure employment for persons seeking employment or employees for employers. However, the term "employment agency" shall not include any person engaged in the business of consulting or recruiting, and who in the course of such business is compensated solely by any employer to identify, appraise, or recommend an individual or individuals who are at least 18 years of age or who hold a high school diploma for consideration for a position, provided that in no instance is the individual who is identified, appraised, or recommended for consideration for such position charged a fee directly or indirectly in connection with such identification, appraisal, or recommendation, or for preparation of any resume, or on account of any other personal service performed by the person engaged in the business of consulting or recruiting; but this exclusion is not applicable to theatrical employment agencies or domestic service employment agencies.

The term "employer" means any person employing or seeking to employ any person for hire.

The term "employee" means any person performing or seeking to perform work or services of any kind or

character        whatsoever        for        hire.

The term "person" means any person, firm, association, partnership        or        corporation.

The term "employment counsellor" means employees of any employment agency who interview, counsel, or advise applicants or employers or both on employment or allied problems, or who make or arrange contracts or contacts between employers and employees. The term "employment counsellor" includes employees who solicit orders for employees from prospective employers.

* * * *

The term "department" means the Department of Labor.

The term "Director" means the Director of the Department        of        Labor.

The term "fee" means money or a promise to pay money. The term "fee" also means and includes the excess of money received by any such licensee over what he has paid for transportation, transfer of baggage, or lodging, for any applicant for employment. The term "fee" also means and includes the difference between the amount of money received by any person, who furnishes employees or performers for any entertainment, exhibition or performance, and the amount paid by the person receiving the amount of money to the employees or performers whom he hires to give such entertainment, exhibition or performance.

110. That it has since been discovered by MEIER's undersigned counsel, following a routine telephone inquiry made to the Illinois Supreme Court Clerk's Office, that "LOTWML" never registered with that Office as required by Supreme Court Rule 721 for all corporations before they can practice law in the State of Illinois.

111. That in order to determine the reason for said lack of any record of registration with Illinois Supreme Court Clerk's Office as is required by Supreme Court Rule 721 by Illinois

Supreme Court Clerk's Office, thereafter, Petitioner's counsel
conducted a routine internet inquiry via the official website
(http://www.ilsos.gov/corporatellc/) maintained Office of the
Illinois Secretary of State (hereinafter referred to as the
"Secretary of State") that revealed upon submitting "LOTWML" for
an online inquiry that such name did not match any records in
said Secretary of State's Corporation/LLC-GS Search database as
shown on the true and correct print-out thereof attached hereto
and incorporated herein pursuant to 735 ILCS 5/2-1401(b).

    112.    That thereafter, MEIER's counsel ordered and a
Certification from the Secretary of State to formally confirm
that no record existed with respect to "LOTWML".

    113.    That thereafter, MEIER's counsel obtained from the
Secretary of State, a signed original Certification bearing its
official seal dated October 5, 2007 that confirms, shows and
proves that, as of said date, the Secretary of State's an
examination of the records of said Office "... does not disclose
that a corporation, either domestic or foreign, entitled
"LOTWML" was ever incorporated or licensed to transact business
in this State". (See copy of Office of the Illinois Secretary of
State's Original Certification bearing its official seal dated
October 5, 2007 attached hereto.)

    114. That at all times relevant 805 ILCS 5/2.15 provided
that corporate existence shall begin upon the filing of articles
of incorporation and 805 ILCS 5/2.10 provided that a corporation
must file its Certificate of Incorporation with the Secretary of
State before operation as business can commence. Since all
corporations are strict creatures of statute, Articles of
Incorporation must be filed with the Secretary of State
containing: (1) the name of the corporation, including indicia
of corporate status (Inc., Ltd., Co., etc.); (2) the number of

authorized shares; (3) the name and address of the registered agent and office; and (4) the name and address of each incorporator. Said Secretary of State's Certification established that the non-existent plaintiff "LOTWML" never complied with said statutory provision and therefore never came into being.

115. That by reason of the fact the non-existent plaintiff "Law Offices of Todd W. Musburger, Ltd." was never incorporated or licensed to transact business in this State under the Illinois Business Corporations Act nor ever registered as an assumed business name in the County of Cook as required under the Assumed Business Name Act, "LOTWML." never came into being and was at all times relevant a non-entity (not a natural or legal person), but a mere, never incorporated, unregistered, unlawfully assumed "fictitious" purported corporate name trade name that happened to included the misleading and false designation "Ltd.".

116. That in Illinois, as stated above, since corporations are strictly creatures of statute, artificial persons that cannot exist without the authority of law and compliance with the procedures to establish cognizable corporations are mandatory, only duly and actually incorporated corporations, not sham or fictitious names such as the never incorporated, non-existent plaintiff, may possess and exercise those powers granted by statute, include the purely, in its corporate name. Under Illinois law corporate powers authorized under 805 ILCS 5/3.10 may only be exercised by duly incorporated corporations.

117. That at all times relevant "LOTWML" has never existed as a corporation and was thus a non-entity lacking any and all lawful authority and capacity. See, e.g., 805 ILCS 5/3.10

118. That MEIER's counsel also made an inquiry to the Office of the County Clerk of Cook County (hereinafter referred to as the "County Clerk") to determine whether the name "LOTWML" had ever been duly registered as an assumed business name in the County of Cook as was at all times required under the Illinois Assumed Business Name Act and discovered that it had never been so registered.

119. That thereafter, MEIER's counsel ordered and obtained a Certification from the County Clerk to formally confirm that no record existed with respect to "LOTWML".

120. That thereafter, MEIER's counsel obtained from the County Clerk, a signed original Certification bearing its official seal dated October 5, 2007 that confirms, shows and proves that, as of said date, as of said date, the County Clerk's examination of the records of said Office discloses that the non-existent "LOTWML" was never registered as an assumed business name in the County of Cook as required under the Assumed Business Name Act of Illinois. (See copy of Office of the County Clerk of Cook County's signed certification [and receipt] obtained October 5, 2007 bearing its official seal attached hereto.

121. That at all times relevant, an Illinois corporation had no legal right to use any name other than that under which it is organized and use by a corporation of a name different from its legal corporate name was against the public policy of the State, that was at all times relevant embodied in Illinois Business Corporations Act and the Illinois Assumed Business Name Acts.

122. That at all times relevant of the Illinois Business Corporations Act (805 ILCS 5/4.05) provided in pertinent part:

Sec. 4.05. Corporate name of domestic or foreign

(a) The corporate name of a domestic corporation or of
a foreign corporation organized, existing or subject
to the provisions of this Act:

(1) Shall contain, separate and apart from any other
word or abbreviation in such name, the word
"corporation", "company", "incorporated", or
"limited", or an abbreviation of one of such words...

\* \* \*

(7) Shall be the name under which the corporation
shall transact business in this State unless the
corporation shall also elect to adopt an assumed
corporate name or names as provided in this
Act; provided, however, that the corporation may use
any divisional designation or trade name without
complying with the requirements of this Act, provided
the corporation also clearly discloses its corporate
name. |

\* \* \*

123. That at all times relevant of the Illinois Business
Corporations Act (805 ILCS 5/4.15) provided in pertinent part:

Sec. 4.15. Assumed corporate name.

        (a)    A    domestic    corporation    or    a    foreign
corporation admitted to transact business or
attempting to gain admission to transact business may
elect to adopt an assumed corporate name that complies
with the requirements of paragraphs (2), (3), (4), (5)
and (6) of subsection (a) of Section 4.05 of this Act
with respect to corporate names.
        (b)    As used in this Act, "assumed corporate
name" means any corporate name other than the true
corporate name, except that the following shall not
constitute the use of an assumed corporate name under
this Act:
                (1) the identification by a corporation of
its business with trademark or service mark of which
it is the owner or licensed user; and
                (2) the use of a name of a division, not
separately incorporated and not containing the word
"corporation", "incorporated", or "limited" or an

37

abbreviation of one of such words, provided the
corporation also clearly discloses its corporate name.
            (c) Before transacting any business in this
State under an assumed corporate name or names, the
corporation shall, for each assumed corporate name,
pursuant to resolution by its board of directors,
execute and file in duplicate in accordance with
Section 1.10 of this Act, an application setting
forth:
            (1) The true corporate name.
            (2) The state or country under the laws of
which it is organized.
            (3) That it intends to transact business
under an assumed corporate name.
            (4) The assumed corporate name which it
proposes to use.

                        * * *

124. That all times relevant the Illinois Assumed
Business Name Act (805 ILCS 405) provided in pertinent
part:

                        * * *

        Sec. 1. Certificate; misrepresentation. No person
or persons shall conduct or transact business in this
State under an assumed name, or under any designation,
name or style, corporate or otherwise, other than the
real name or names of the individual or individuals
conducting or transacting such business, unless such
person or persons shall file in the office of the
County Clerk of the County in which such person or
persons conduct or transact or intend to conduct or
transact such business, a certificate setting forth
the name under which the business is, or is to be,
conducted or transacted, and the true or real full
name or names of the person or persons owning,
conducting or transacting the same, with the post
office address or addresses of such person or persons
and every address where such business is, or is to be,
conducted or transacted in the county. ...

                        * * *

        Sec. 5. Any person or persons carrying on,
conducting or transacting business as aforesaid, who

shall fail to comply with the provisions of this Act,
shall be guilty of a Class C misdemeanor, and each day
any person or persons conducts business in violation
of this Act shall be deemed a separate offense.

* * *

125. That in addition to the fact the non-existent "LOTWML"
never acquired the legal capacity to sue and was not a non-
entity (not a natural or legal person), but a mere, never
incorporated, assumed purported corporate name, an unregistered,
unlawfully assumed "fictitious" trade name that happened to
included the misleading and false designation "Ltd." but never
actually existed. LOTWML never acquired the legal capacity to do
business with MEIER or anyone else.

126. That Petitioner's counsel subsequently obtained from
the Illinois Supreme Court Clerk's, a signed original
Certification bearing its official seal dated October 9, 2007
that confirms, shows and proves that, as of said date, an
examination of the records of said Office disclosed that the
non-existent plaintiff " LOTWML" was never registered to
practice law under Illinois Supreme Court Rule 721(c) as is
confirmed, shown and proved by the Illinois Supreme Court
Clerk's original Certificate dated October 9, 2007 revealing no
record of registration of " LOTWML" (See copy of Illinois
Supreme Court Clerk's Certificate dated October 9, 2007
revealing no record of registration of "LOTWML" attached hereto
and incorporated herein.)

127. That at all times relevant Illinois Supreme Court Rule
721 provided in pertinent part:

* * *

(c) No corporation, association, limited liability
company, or registered limited liability partnership
shall engage in the practice of law in Illinois, or
open or maintain an establishment for that purpose in

39

Illinois, without a certificate of registration issued
by this court.

* * *

(e) An application for registration shall be in
writing signed by an authorized shareholder of the
corporation, ... and filed with the clerk of this
court.... The application shall contain the following:

(1) the name and address of the corporation...

(2) the statute under which it is formed....

* * *

128. That, at all times relevant, the Illinois Attorney Act
(705 ILCS 205/1) provided in pertinent part:

* * *

Sec. 1. No person shall be permitted to practice as an
attorney or counselor at law within this State without
having previously obtained a license for that purpose
from the Supreme Court of this State. No person shall
receive any compensation directly or indirectly for
any legal services other than a regularly licensed
attorney, nor may an unlicensed person advertise or
hold himself or herself out to provide legal services.
* * *

Any person practicing, charging or receiving fees for
legal services or advertising or holding himself or
herself out to provide legal services within this
State, either directly or indirectly, without being
licensed to practice as herein required, is guilty of
contempt of court and shall be punished accordingly,
upon complaint being filed in any Circuit Court of
this State. Such proceedings shall be conducted in the
Courts of the respective counties where the alleged
contempt has been committed in the same manner as in
cases of indirect contempt and with the right of
review by the parties thereto.

129.    That by reason of the foregoing under "LOTWML",
like BRIAN, could not ever qualify for either a law license or
be registered to practice law under Illinois Supreme Court Rule
711, as is shown and proved by the Illinois Supreme Court

Clerk's original Certificate dated October 9, 2007 revealing no record of registration of "LOTWML" (See copy of Illinois Supreme Court Clerk's Certificate dated October 9, 2007 revealing no record of registration of "LOTWML" attached hereto and incorporated herein.)

130. That Defendants violated 705 ILCS 205/1 Illinois Supreme Court Rule 711 by billing MEIER for employment procurement commissions and/or legal services to Meier using, when convenient for them, the non-existent name LOTWML for the reasons herein stated.

131. That by reason of said LOTWML's non-existence, as show from the Illinois Secretary of State's Certification attached hereto and incorporated herein, at all time relevant the non-existent LOTWML was never incorporated and therefore, because it did not lawfully exist as an actual corporation, it could not satisfy the basic requirements Illinois Supreme Court Rule 711 and so could not in anyway be licensed or authorized to do any business, including but not limited to the practice law in the State of Illinois.

132. That by reason of being a non-existent, LOTWML therefore lacked the lawful authority and capacity to do anything in said assumed and fictitious name.

133. That 805 ILCS 105/101.20 provides:

Sec. 101.20. Certificates and certified copies of certain documents to be received in evidence. All certificates issued by the Secretary of State in accordance with the provisions of this Act and all copies of documents filed in the Secretary's office in accordance with the provisions of this Act when certified by him or her, shall be taken and received in all courts, public offices, and official bodies as prima facie evidence of the facts therein stated. A certificate by the Secretary of State under the Great Seal of the State of Illinois, as to the existence or nonexistence of the facts relating to corporations

41

which would not appear from a certified copy of any of
the foregoing documents or certificates shall be taken
and received in all courts, public offices, and
official bodies as prima facie evidence of the
existence or nonexistence of the facts therein stated.
(Source: P.A. 84-1423.)

134. That by reason of the foregoing matters of public
record of which this court ought take judicial notice of the
documents attached that show all dealings and contracts between
MEIER and MUSBURGER, LTD., MUSBURGER, LOTWML and BRIAN are void
*ab initio* and a nullity by reason of the fact of non-existence
of LOTWML, a non-entity and mere fictitious name never
registered in accordance with any law that could therefore did
not and could never have either the requisite capacity or
interest to do anything.

135. That, on information and belief, Defendants
individually, jointly, and in combination and conspiracy, with
their named and unnamed co-conspirators, within the meaning of
the Racketeer Influenced and Corrupt Organizations Act, 18
U.S.C. § 1961 et. seq., (hereinafter referred to as the "RICO
Act") were, on information and belief, used by them as a
racketeering enterprise to accomplish the said unlawful acts and
to keep said entity. MUSBURGER, LTD., functioning and alive and
perpetuated their activities as the non-existent entity LOTWML,
at all times relevant which, run by and under MUSBURGER's
domination and control, participated in and effected interstate
commerce as herein alleged.

136. That, on information and belief, as is set forth more
fully above, on information and belief, Defendants and their co-
conspirators conspired to conduct and/or to participate directly
in the conduct of the affairs of the through a pattern of
racketeering activity Defendants illegal and criminal activities
constituted a Pattern of Racketeering activity and conspiracy

involving violations of 1956(a)(1)(B)(ii) and 18 U.S.C. §
1956(a)(1)(A)(i), and acts chargeable under any of the above
mentioned statutes with the intent to promote the carrying on of
specified unlawful activity all in violation of RICO.

137. The, on information and belief, numerous illegal
predicate acts, which constitute the pattern of racketeering
activity, and which were agreed to, and committed by, the
Defendants and their co-conspirators, are set forth more
specifically above and were accomplished through the use of the
wires, U.S. Mail and were and are violations of the criminal
laws of the United States and the State of Illinois, and
conspiracy to commit the acts complained of herein under federal
and state law.

138. That, on information and belief, Defendants obtained,
as a direct result of their racketeering activity, both directly
and indirectly, income from MEIER and other clients and
businesses substantial compensation as a result of their
racketeering activity.

139. That Defendants' racketeering activity caused MEIER to
suffer injury to his person, business and property pursuant to §
1962 as more fully set forth above and as will be shown by the
proofs.

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Declaring that Defendants' corrupt activity alleged
herein be adjudged and decreed to be in violation of RICO Act;

B.    Awarding Plaintiffs and against Defendants, jointly
and severally, general, compensatory and punitive damages in a
sum in great excess of Seventy Five Thousand ($75,000.00)
dollars;

C.    Awarding Plaintiff equitable relief and a declaratory
judgment be entered against the Defendants and in their favor

43

declaring that the coerced contracts that they signed be declared illegal, against public policy, void *ab initio* and of no force and effect, that this Court declare the rights of the that a judgment of rescission of the above-mentioned coerced contracts be entered against Defendants jointly and severally, that all payments heretofore made by the pursuant to said contracts and illegal conduct be accounted for, disgorged and refunded to Plaintiff with prejudgment interest there on pursuant to 735 ILCS 5/2-1303;

    D.    Awarding Plaintiffs treble damages under 18 U.S.C. § 1964 of the RICO Act;

    E.    Awarding Plaintiffs civil penalties pursuant to under the RICO Act;

    F.    Awarding Plaintiffs costs, disbursements and reasonable attorneys fees under the RICO Act; and

    G.    Awarded Plaintiffs such other and further relief, as may be appropriate, necessary, just and proper in the premises.

## COUNT II
### (Conspiracy to Violate Racketeer Influenced and Corrupt Organizations Act ["RICO"] - § 1962(d)) Claim)

1-139. Plaintiff reallege paragraphs 1 through 139 of Count I as paragraphs 1 through 139 of this Count II as if set forth fully herein.

149. That on information and belief, Defendants forgoing acts were a product of their tacit and/or overt, express and/or implied agreement, combination and conspiracy as aforesaid to plan, further and/or accomplish said endeavors that, if and/or when completed would violate the RICO Act to Plaintiff's detriment and damage as aforesaid.

WHEREFORE, Plaintiffs pray for judgment as follows:

    A.    Declaring that Defendants' corrupt activity alleged herein be adjudged and decreed to be in violation of RICO Act;

B.   Awarding Plaintiffs and against Defendants, jointly and severally, general, compensatory and punitive damages in a sum in great excess of Seventy Five Thousand ($75,000.00) dollars;

C.   Awarding Plaintiff equitable relief and a declaratory judgment be entered against the Defendants and in their favor declaring that the coerced contracts that they signed be declared illegal, against public policy, void *ab initio* and of no force and effect, that this Court declare the rights of the that a judgment of rescission of the above-mentioned coerced contracts be entered against Defendants jointly and severally, that all payments heretofore made by the pursuant to said contracts and illegal conduct be accounted for, disgorged and refunded to Plaintiff with prejudgment interest there on pursuant to 735 ILCS 5/2-1303;

D.   Awarding Plaintiffs treble damages under 18 U.S.C. § 1964 of the RICO Act;

E.   Awarding Plaintiffs civil penalties pursuant to under the RICO Act;

F.   Awarding Plaintiffs costs, disbursements and reasonable attorneys fees under the RICO Act; and

G.   Awarded Plaintiffs such other and further relief, as may be appropriate, necessary, just and proper in the premises.

## COUNT III

### Legal Malpractice

1-140.   MEIER reallege paragraphs II through 140 of Count I as paragraphs 1 through 140 of this Count III as if set forth fully herein.

141.   That, at all relevant times, MUSBURGER, LTD and MUSBURGER owed to MEIER, their client, the following duties, defined by the Illinois Code of Professional Responsibility:

45

Rule 1.1   Competence

(a) A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation necessary for the representation.

\* \* \* \*

Rule 1.3   Diligence

A lawyer shall act with reasonable diligence and promptness in representing a client.

\* \* \* \*

Rule 1.4   Communications

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

142. That, between the end of May, 2003 and September 22, 2003, Musburger breached his duties to MEIER, as defined by the foregoing provisions of the Illinois Code of Professional Responsibility, in one or more of the following respects:

a.   Failed to keep track of the fact that Conn had not, in fact, signed the proposed agreement, due to the lack of any form of "date-up," "follow-up" or "tickler" system in his office, a fact unknown to MEIER until it was disclosed by Brian Musburger in the course of his deposition on March 31, 2006.

b.   In the alternative, knew and was advised by Conn and/or his agent, George Hiltzik, shortly after May 31, 2003, that Conn was not inclined to sign such an agreement, but did not, at any time, disclose this fact to MEIER.

c.    Affirmatively misrepresented to MEIER that the proposed agreement had been "taken care of" or signed by Conn when he knew that, in fact, it had not been signed by Conn.

143. That, had MEIER been advised between the end of May, 2003 and the time he discharged MUSBURGER on September 22, 2003 that Conn had not signed the proposed agreement, he could and probably would have persuaded Conn to sign it.

144. That MUSBURGER did not discover that Conn had not signed the Agreement until after MEIER discharged MUSBURGER on September 22, 2003. By that time, the negotiating situation had changed materially, and MEIER's opportunity to persuade Conn to sign the proposed agreement was substantially reduced.

145. That as matters turned out, WLS did, in the Spring of 2004, submit an offer to Conn alone which Conn accepted, to the exclusion of MEIER from the show.

146. That as a direct and proximate result of MUSBURGER's professional negligence, MEIER became the victim of the very "divide and conquer" strategy which he and Musburger had sought to avoid by having Conn sign the proposed agreement, to MEIER's great personal and financial cost.

WHEREFORE, Defendant/Counter-Plaintiff GARRY MEIER respectfully prays that this Honorable Court grant judgment to him for compensatory damages in an amount in excess of the jurisdictional limit of the Law Division of the Circuit Court of

Cook County, the exact sum to be proven by the evidence,

together with the costs of this action.

COUNT IV
BREACH OF FIDUCIARY DUTY –
DISOBEDIENCE OF CLIENT DIRECTIVES

1 – 146. That MEIER hereby repeats and realleges Paragraphs 1 through 146 of Count III of this Counterclaim as Paragraphs 1 through 146 of this Count IV as though fully set forth herein.

147. That, at all relevant times, MUSBURGER, LTD. and MUSBURGER owed MEIER, their client, the following duties defined by the Illinois Code of Professional Responsibility:

Rule 1.2    Scope of Representation

(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (c), (d) and (e), and shall consult with the client as to the means by which they are to be pursued. A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.

Rule 1.4    Communications

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

148. That the course of conduct in which MUSBURGER, LTD. and Musburger engaged between September 11, 2003 and September

22, 2003 breached the foregoing duties in one or more of the following respects:

a.    Refused to abide by MEIER's decisions concerning the objectives of their representation of him, or the means by which those objectives were to be pursued, by engaging in meetings and phone conversations with executives from WLS and representatives of other interested parties, such as Roe Conn, at a time when they knew and were well aware that MEIER did not wish them to be having such meeting or engaging in such contacts.

b.    Refused and failed to keep MEIER reasonably informed about the status of their representation of him by failing to disclose to him, in timely fashion, the existence of the September 18, 2003 meeting, the contents of the discussions held at the meetings of September 11, 2003 or September 18, 2003, or the existence and contents of the telephone contacts he had with executives of WLS and with George Hiltzik between September 11, 2003 and September 22, 2003.

c.    Refused and failed to comply in timely fashion with the requests for information which MEIER made, directly and through Cynthia Fircak, on September 12, 2003, September 13, 2003 and September 15, 2003.

d.    Made misrepresentations to MEIER about, and attempted to conceal from MEIER, the fact that between September 11, 2003 and September 22, 2003, they attempted, without authority or consent from MEIER, to negotiate, on his behalf, a renewal contract for his services with WLS, at a time when they knew that MEIER had expressly forbidden them to engage in such negotiations.

149. That the course of conduct in which MUSBURGER, LTD. and MUSBURGER engaged between September 11, 2003 and September 22, 2003 constituted a series of serious and repeated breaches of their fiduciary duties of honesty and loyalty to MEIER.

150. That at and after the date MEIER discharged MUSBURGER, LTD. and MUSBURGER, he was making payments to them, under the terms of the 1999 Musburger Agreement, equal to five percent

49

(5%) of the compensation paid to him under the 1999 WLS Agreement.  These payments totaled the sum of $19,264.46.

151. That by virtue of their breach of their fiduciary duties to MEIER, MUSBURGER, LTD. and MUSBURGER have been unjustly enriched and should forfeit all claim to these payments and be required to disgorge them.

152. That, additionally, by virtue of their breach of their fiduciary duties to MEIER, MUSBURGER, LTD. and MUSBURGER have forfeited all claim to any compensation for services supposedly rendered to MEIER in their attempts to negotiate a renewal of the 1999 WLS Agreement.

WHEREFORE, Plaintiff GARRY MEIER respectfully prays that this Honorable Court:

a.   Find and declare that MUSBURGER, LTD. and Musburger breached their fiduciary duties of honesty and loyalty to MEIER;

b.   Require the disgorgement, by MUSBURGER, LTD. and Musburger, of any and all monies paid by MEIER to MUSBURGER, LTD. and Musburger on, before or after after September 22, 2003;

c.   Find and declare that MUSBURGER, LTD. and Musburger have, by virtue of their breaches of fiduciary duty, forfeited, and are not entitled to, any compensation for any services supposedly rendered to MEIER in their attempts to negotiate a renewal of the 1999 WLS Agreement; and

d.   Award MEIER damages proven to have been caused by said breaches of fiduciary duty, in an amount to be shown by the evidence at trial, and

e.   Grant such other and further relief as may be just and equitable.

COUNT V

LEGAL MALPRACTICE –
FAILURE TO DISCLOSE NEW OFFER

1 - 153That MEIER hereby repeats and realleges Paragraphs 1 through 153 of Count IV of this Complaint as Paragraphs 1 through 153 of this Count V as though fully set forth herein.

154. That at all relevant times, MUSBURGER, LTD. and MUSBURGER owed MEIER, their client, the following duties defined by the Illinois Code of Professional Responsibility:

Rule 1.4    Communications

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

155. The failure of MUSBURGER, LTD. and MUSBURGER to communicate to MEIER the terms and conditions of the offer made to him on September 18, 2003 was a breach of the foregoing duties that they owed to MEIER.

156. That as a direct and proximate result of the breach by MUSBURGER, LTD. and MUSBURGER of their professional duties and obligations to MEIER, MEIER sustained damages including, but not limited to, the loss of an employment opportunity worth a minimum of $1.5 million to $1.6 million per year for ten years.

51

WHEREFORE, Plaintiff GARRY MEIER respectfully prays that this Honorable Court grant judgment to him for compensatory and punitive damages in an amount in excess of $75,000.00, the exact sum to be proven by the evidence, together with the costs of this action.

## COUNT VI

### PUBLIC DISCLOSURE OF PRIVATE FACTS

1 - 156 That MEIER hereby repeats and realleges Paragraphs 1 through 157 of Count V of this Complaint as Paragraphs 1 through 156 of this Count VI as though fully set forth herein.

WHEREFORE, Plaintiff GARRY MEIER respectfully prays that this Honorable Court enter judgment in favor of Defendant-Counter Plaintiff and against Defendants TODD W. MUSBURGER, LTD. d/b/a LAW OFFICES OF TODD W. MUSBURGER, LTD. in an amount in excess of the jurisdictional limit of the Law Division of the Circuit Court of Cook County.

## COUNT VII
### (Breach of Fiduciary Duty - Conflict of Interest)

1 - 156 That MEIER hereby repeats and realleges Paragraphs 1 through 156 of Count VI of this Complaint as Paragraphs 1 through 156 of this Count VII as though fully set forth herein.

157. That at all times relevant hereto, Rule 1.7 of the Illinois Supreme Court's Rules for Professional Responsibility governing the conduct of attorneys provided as follows:

Rule 1.7. Conflict of Interest: General Rule

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

> (1) the lawyer reasonably believes there presentation will not adversely affect the relationship with the other client; and

> (2) each client consents after disclosure.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

> (1) the lawyer reasonably believes the representation will not be adversely affected; and

> (2) the client consents after disclosure.

(c) When representation of multiple clients in a single matter is undertaken, the disclosure shall include explanation of the implications of the common representation and the advantages and risks involved.

WHEREFORE, Plaintiff GARRY MEIER respectfully prays that this Honorable Court:

a. Find and declare that MUSBURGER, LTD. and Musburger breached their fiduciary duties of loyalty to MEIER;

b. Require the disgorgement, by MUSBURGER, LTD. and Musburger, of any and all monies paid by MEIER to MUSBURGER, LTD. during the period in which his representation was conflicted.

c. Find and declare that MUSBURGER, LTD. and Musburger have, by virtue of their breaches of fiduciary duty, forfeited,

and are not entitled to, any compensation for any services supposedly rendered to MEIER in their attempts to negotiate a renewal of the 1999 WLS Agreement;

d.    Award MEIER damages proven to have been caused by said breaches of fiduciary duty, in an amount to be shown by the evidence at trial, and

e.    Grant such other and further relief as may be just and equitable.

<u>COUNT VIII</u>
(Breach of Fiduciary Duty-Fraud)

1-57.    That MEIER hereby repeats and realleges Paragraphs 1 through 157 of Count VII of this Complaint as Paragraphs 1 through 157 of this Count VIII, as though fully set forth herein.

158. That the fiduciary duties which MUSBURGER, LTD. and Musburger owed MEIER included, *inter alia*, compliance by MUSBURGER, LTD. and Musburger to the following provisions of the Illinois Supreme Court's Rules for Professional Responsibility governing the conduct of attorneys:

Rule 1.5    Fees

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

54

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

\* \* \* \*

Rule 5.4  Professional Independence of a Lawyer

(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1) an agreement by a lawyer with the lawyer's firm, partner, or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2) a lawyer who undertakes to complete unfinished legal business of a deceased lawyer may pay to the estate of the deceased lawyer that proportion of the total compensation which fairly represents the services rendered by the deceased lawyer or may make payments in accordance with Rule 1.17; and

(3) a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement.

(b) A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

159. That by asserting a separate claim against MEIER for the value of the services supposedly rendered by Brian Musburger, MUSBURGER, LTD. and Todd Musburger violated their fiduciary duties to MEIER in one or more of the following respects:

   a.   There was never any understanding or agreement between the parties that Brian Musburger's services, if any, were to be compensated separately for any services rendered or to be rendered by him to MEIER;

   b.   Because Brian Musburger was not, at any relevant time, an attorney, the assertion of a separate claim for fees on his behalf was an exercise in fee-splitting between a lawyer (Todd Musburger) and a non-lawyer (Brian Musburger), which is expressly prohibited by Rule 5.4;

   c.   The Statement was drafted and presented in such a way as to conceal, rather than disclose, the fact that the line reading "40 hours @ $300.00 per hour $12,000.00" relates exclusively to services allegedly performed for MEIER by Brian Musburger, a non-attorney with whom MEIER had no contractual relationship to pay separately for his services.

   d.   Brian Musburger's services were not, under any circumstances, worth $300.00 per hour.

160. That MEIER, though he is appealing and petitioning to vacate a judgment, rather than post an appeal bond, he has recently paid the judgment to LOTWML's attorneys. MUSBURGER and Todd W. Musburger, have, however committed an additional and continuing violation of their fiduciary obligations by including and incorporating that claim into the overall claim they made made via LOTWML.

161. That because MUSBURGER via LOTWML, has continued to breach their fiduciary duties by asserting, the claim for services rendered by BRIAN as part of their overall claim, MEIER has sustained actual damages in that he has been forced to retain counsel to defend himself against that aspect of the claim, and to conduct discovery and other activities relating thereto.

162. That MUSBURGER, LTD. and MUSBURGER asserted the claim against MEIER for $12,000.00 in billing for BRIAN's services with full knowledge and awareness that the billing in question was excessive, unethical, and un-agreed to and was wantonly, maliciously and in knowing violation of their fiduciary obligations under Rules 1.5 and 5.4, and their conduct in this regard fully justifies an award of punitive damages.

WHEREFORE, Plaintiff GARRY MEIER respectfully prays that this Honorable Court enter judgment in favor of Plaintiff and against Defendants:

a. For actual damages, in an amount to be proven by the evidence, and

b. For an award of punitive damages, in an amount sufficient to punish and deter this and other defendants from engaging in similar conduct in the future.

<u>COUNT IX</u>
RESTITUTION - RETURN OF FEES AND COMMISSIONS
ILLEGALLY COLLECTED IN VIOLATION OF THE

## PRIVATE EMPLOYMENT AGENCY ACT

1-162. That MEIER hereby repeats and realleges Paragraphs 1 through 162 of Count VIII of this Complaint as Paragraphs 1 through 162 of this Count IX, as though fully set forth herein.

163. That there was, at all relevant times, in full force and effect, a statute, 225 ILCS 515.1 *et seq.*, commonly known as the Private Employment Agency Act (the "Act"), quoted in relevant part in Count I and reincorporated herein by this reference.

164. That the activities which MUSBURGER conducted on MEIER's behalf were the activities of an "employment agency," as that term is defined in the Act, and the services which Todd W. Musburger and Brian Musburger rendered to MEIER, for which they seek to recover in this action, were the services of "employment counselors" as that term is defined in the Act.

165. That at no time was MUSBURGER, LTD., MUSBURGER or BRIAN licensed in accordance with the requirements of § 1 of the Act, and at no time was either MUSBURGER, LTD., MUSBURGER or BRIAN licensed as an "employment counselor." Moreover, MUSBURGER, LTD., MUSBURGER or BRIAN never filed a schedule of fees with the Department of Labor, as required by the Act, nor had he filed any version of the 1998 Musburger Agreement with the Department of Labor.

166. That under the circumstances set forth in the preceding paragraph, the collection by MUSBURGER, LTD., MUSBURGER or BRIAN, an unlicensed agency and agents, of fees from MEIER, was rendered unlawful by the express terms and provisions of the Act.

167. That under the 1998 Musburger Agreement alone, MUSBURGER illegally collected the sum of $159,311.91 from MEIER in fees, all of which must be returned because they were illegally collected.

168. That further sums, the exact amount of which has not been ascertained, must also be accounted for and disgorged returned by MUSBURGER to MEIER by virtue of having been collected by MUSBURGER under circumstances similar to that which rendered the 1998 Musburger Agreement unlawful.

169. That, additionally, MUSBURGER, LTD., MUSBURGER or BRIAN's failure to obtain a license under the Act, and the failure of either MUSBURGER, LTD., MUSBURGER or BRIAN to obtain a license as an employment counselor unlawful.

WHEREFORE, Plaintiff GARRY MEIER respectfully prays that this Honorable Court enter judgment in favor of Plaintiff and against Defendants:

a. For actual damages, in an amount to be proven by the evidence, and

b. For an award of punitive damages, in an amount sufficient to punish and deter this and other defendants from engaging in similar conduct in the future.

COUNT XI

1-169. That MEIER hereby repeats and realleges Paragraphs 1 through 169 of Count X of this Complaint as Paragraphs 1 through 169 of this Count XI, as though fully set forth herein.

170. That MUSBURGER, LTD., MUSBURGER or BRIAN asserted the claim against MEIER for $12,000.00 in billing for Brian's services with full knowledge and awareness that the billing in question was excessive, unethical, and un-agreed to and was wantonly, maliciously and in knowing violation of MUSBURGER, LTD. and MUSBURGER's fiduciary obligations under Rules 1.5 and 5.4, and his conduct in this regard fully justifies an award of punitive damages.

WHEREFORE, Third Party Plaintiff GARRY MEIER respectfully prays that this Honorable Court enter judgment in his favor, and against Third Party Defendant BRIAN MUSBURGER,

a. For actual damages, in an amount to be proven by the evidence at trial, and

b. For an award of punitive damages, in an amount sufficient to punish and deter this and other defendants from engaging in similar conduct in the future.

## COUNT XII

### (Common Law Fraud and Deceit)

1-170.    That MEIER realleges paragraphs 1 through 170 of Count XI as paragraphs 1 through 170 of this Count XII.

171. That by reason of the foregoing Defendant intentionally committed the foregoing acts and made the aforesaid misrepresentations in order to mislead, trick, cheat and defraud Plaintiff as aforesaid.

WHEREFORE, Plaintiff demands judgment against the Defendants, and each of them, individually, jointly and severally, and that she be awarded general, compensatory and punitive damages in great excess of $75,000.00, plus the costs of this suit, reasonable attorneys fees and such other and further relief as may be proper in the premises.

### COUNT XIII
### (Declaratory Judgment)

1-171.    That MEIER realleges paragraphs 1 through 171 of Count XII as paragraphs 1 through 171 of this Count XIII.

172. That by reason of the foregoing MEIER is entitled to a judicial declaration of his rights pursuant to 735 ILCS 5/2-701 and declaratory relief in connection therewith.

WHEREFORE MEIER PRAYS that a declaratory judgment be entered in favor of Plaintiff and against Defendants pursuant to 735 ILCS 5/2-701 declaring that the all dealing and contracts

with Defendants null and void *ab initio,* as applied, and of no force and effect and that he be awarded reasonable attorneys fees, costs, and all further relief to which the he may be entitled and which this Court may deem proper and just in the premises.

COUNT XIV
(Violations of Illinois Attorneys Act)

1-172.   MEIER incorporates by reference paragraphs 1 though 172 of Count XIII as paragraphs 1 though 172 of this Count XIV.

173. That said Statute and Defendants' actions and omissions are likewise violative of the Illinois Attorney Act.

WHEREFORE Plaintiff prays that he be awarded general, compensatory and punitive damages in great excess of $75,000.00, plus the costs of this suit, reasonable attorneys fees and all further relief to which the he may be entitled and which this Court may deem proper and just in the premises.

Garry Meier, Plaintiff,

By _____
Walter P. Maksym, Jr., his attorney

## ATTORNEY'S RULE 11 CERTIFICATION

The undersigned attorney certifies that he has read the foregoing complaint, that to the best of his knowledge, information, and belief, formed after reasonable inquiry it is well grounded in fact the same is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

_____

Walter P. Maksym, Jr., Plaintiff's Attorney

Walter P. Maksym, Jr.
Attorney at Law
2056 North Lincoln Avenue
Chicago, IL 60614-4525
Telephone: (773) 929-2923



SERVICES      PROGRAMS      PRESS      PUBLICATIONS      DEPARTMENTS      CONTACT

## CORP/LLC - CERTIFICATE OF GOOD STANDING

Your search for Law Offices of Todd W. Musburger, Ltd., did not match any records in the Corporation/LLC-GS Search database.

Please try again.

**Return to Search**

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

*File Number*



## To all to whom these Presents Shall Come, Greeting:

*I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that*

AN EXAMINATION OF THE RECORDS OF THIS OFFICE DOES NOT DISCLOSE A CORPORATION, EITHER DOMESTIC OR FOREIGN, ENTITLED LAW OFFICES OF TODD W. MUSBURGER, LTD., AS HAVING BEEN INCORPORATED OR LICENSED TO TRANSACT BUSINESS IN THIS STATE AT ANY TIME. **************************************************************



**In Testimony Whereof,** *I hereto set my hand and cause to be affixed the Great Seal of the State of Illinois, this* 5TH *day of* OCTOBER *A.D.* 2007 .

*Jesse White*

SECRETARY OF STATE

Authentication #: 0727801661
Authenticate at: http://www.cyber.riveillinois.com

# Office of the County Clerk

## David Orr, Cook County Clerk



**Assumed Name Unit/
Business Registration**
Vital Statistics
P.O. Box 642570
Chicago, IL 60664-2570
312-603-5652

Dear Sir or Madam:

This office has the responsibility of accepting registrations for those businesses (other than limited partnerships and corporations) which are located in Cook County, Illinois and which operate under a name other than the true name (s) of the owner (s).  All businesses in this category have been required to register with the Cook County Clerk's office since August of 1941.  This office retains such filings in its active files.

We certify that a check of this office's records indicates that no registration has ever been made with this office under the provisions of the Assumed Business Name Act of Illinois for the following business name:

LAW OFFICES OF TODD W. MUSBURGER, LTD.

---

If you are in need of further information, please contact a representative of the Assumed Business Name Unit at (312) 603-5652.

Very truly yours,

DAVID ORR
Cook County Clerk

Timothy J. Dever
Director
Vital Records Division

AB11a



# Cook County Clerk's Office

Bureau of Vital Statistics
118 North Clark Street
Chicago, Illinois 60602
312- 603-7790

# Sales Receipt

| | |
|---|---|
| Transaction #: | 87116 |
| Page: | 1 of 1 |
| Date: | 10/5/2007 10:34:41 A |
| Cashier: | 305 |
| Register #: | 51 |

Customer:                                    Ship To:

| Rep | Item Lookup Code | Description | Quantity | Price | Extended |
|---|---|---|---|---|---|
| | ABN_MISC | Miscellaneous | 1 | $1.50 | $1.50 |

| | |
|---|---|
| Sub Total | $1.50 |
| Total | $1.50 |
| Check Tendered | $1.50 |
| Change Due | $0.00 |

### UNITED STATES OF AMERICA

STATE OF ILLINOIS     )
                         ) S.S.
SUPREME COURT     )

     I, JULEANN HORNYAK, Clerk of the Supreme Court of the State of Illinois and keeper of the records, files and Seal thereof, do hereby certify that on the date set out herein, I caused a search to be made of records maintained pursuant to Supreme Court Rule 721. That search did not reveal that "Law Offices of Todd W. Musburger, Ltd." is currently registered with the Supreme Court of Illinois pursuant to Supreme Court Rule 721, nor do the records show that "Law Offices of Todd W. Musburger, Ltd." was registered in the past.

                     IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the Seal of said Court this 9th day of October, 2007.

                                    *Juleann Hornyak*
                                          Clerk,

Supreme Court of the State of Illinois.