# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **GARRY MEIER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **No. 08 C 216** |
| ) | |
| **TODD W. MUSBURGER, individually, and** ) | |
| **d/b/a as a non-existent entity known as "Law** ) | **Magistrate Judge Jeffrey Cole** |
| **Offices Of Todd W. Musburger, Ltd.", TODD** ) | |
| **W. MUSBURGER, LTD., an Illinois** ) | |
| **corporation, and BRIAN MUSBURGER,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

This case began five years ago with a dispute between Garry Meier, a popular radio talk show host in Chicago, and his attorney, Todd Musburger. Unfortunately, their falling-out came in the middle of contract negotiations between Mr. Meier and the radio station for which he worked, and it had the effect of scuttling any deal that might have been made. That left Mr. Meier without a show or income, and left Mr. Musburger without that portion of the fees he otherwise would have earned had he been able to negotiate a new contract for Mr. Meier. Each felt badly used by the other, and as inevitably occurs when people quarrel over money and perceived wrongdoing, the parties found themselves in litigation. Mr. Musburger sued for the fees he said he had earned in connection with the unsuccessful negotiation for the new contract; Mr. Meier responded with a counter claim for negligence and breach of fiduciary duties. The case was ultimately tried to a jury, which found for Mr. Musburger. An appeal followed in the Illinois Appellate Court.

Rather than awaiting the outcome of the appeal – the case remains pending – Mr. Meier sued Mr. Musburger in this court charging that he violated the Racketeer Influenced and Corrupt Organization Act ("RICO"). 18 U.S.C. § 1961 *et seq.* The 64-page First Amended Complaint ("Complaint") – much of which is single-spaced – contains two RICO counts and 26 claims under Illinois law. The first 133 paragraphs of the 181-paragraph complaint span 40 pages and purport to set forth the operative facts on which all the counts are based. They are the same facts that underlay the state court complaint. Without the RICO count there would be no federal jurisdiction since the parties are both citizens of Illinois. *See Lincoln Property Co. v. Roche*, 546 U.S. 81, 89 (2005).

Mr. Musburger has moved to dismiss the complaint, arguing, *inter alia*, that: (1) because the jury's verdict in the state court had settled the underlying dispute in his favor, the complaint was barred by either or both the *Rooker-Feldman* doctrine and the doctrine of *res judicata*, and (2) Mr. Meier had failed to adequately state a claim under RICO. As we shall see, the *Rooker-Feldman* doctrine is inapplicable, and the question of whether *res judicata* applies eludes easy answer for, as the Seventh Circuit has said, "[t]o be blunt, we have no idea what the law of Illinois is on the question whether a pending appeal destroys the claim preclusive effect of a judgment." *Rogers v. Desiderio*, 58 F.3d 299, 302 (7th Cir. 1995).[1] But no matter, because the unanswerable argument is that the RICO claims are deficient and constitute an attempt to fabricate federal jurisdiction, and an action will not lie in federal court if the federal claims are made solely for the purpose of obtaining jurisdiction or where such claims are wholly insubstantial and frivolous. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513 (2006); *Jagla v. LaSalle Bank*, 253 Fed.Appx. 597, 599 (7th Cir. 2007).

---

[1] Because it turns out that there is no federal jurisdiction, that issue cannot be addressed. *Cf. White v. Elrod*, 816 F.2d 1172, 1175 (7th Cir. 1987)(distinguishing between a jurisdictional bar and *res judicata*).

But there is one more wrinkle. In response to the motion to dismiss, Mr. Meier's counsel did an odd thing: he moved to stay the case under the *Colorado River* abstention doctrine, *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800 (1976), and the Seventh Circuit's decision in *Rogers, supra,* because of the pending appeal of the state court judgment. That's a curious move from a plaintiff who filed the federal lawsuit and initially insisted that it proceed while his state appeal was pending. One reason might have been to avoid the state court judgment's possible immediate preclusive effect in the hope the case would be reversed during the stay. But during a hearing on the motion, Mr. Meier's counsel expressed the view that the outcome of the appeal was irrelevant to the outcome of this case.

It was his position that if the state court case were reversed, this case could still proceed, and if it were affirmed, this case would proceed apparently in tandem with a new trial in the state court. Given that theory – which seems wrong [2] – no purpose would be served by a stay. In any event, the *Colorado River* doctrine is inapplicable here. Under the doctrine, there are limited circumstances where a federal court may abstain from exercising its jurisdiction over a case where there is a parallel state court suit. *See Colorado River Water Conservation Dist.,* 424 U.S. at 813-17; *Tyrer v. City of South Beloit, Ill.,* 456 F.3d 744, 747 (7th Cir. 2006). As Mr. Meier's RICO claims are deficient, there is no jurisdiction to abstain from exercising. *See infra.*

---

[2] Given the congruence between the factual allegations in the Complaint in this case and the facts that underlay the state court case, it seems unlikely that the plaintiff would not be collaterally estopped from relitigating facts decided adversely to him in the state court case. And, at a minimum, an affirmance of the dismissal of the counter claim charging that Mr. Musburger was operating as an employment agency without being licensed would preclude relitigation of that claim in this case.

# I.
## FACTUAL BACKGROUND [3]

### A.
### The Negotiations For The 2004 Renewal Of The 1999 Contract Begin

For several years prior to 2003, Mr. Meier had co-hosted a radio talk show with Roe Conn on WLS-AM in Chicago. Beginning in 1998, he was represented in his contract negotiations with the station by Mr. Musburger, an attorney licensed to practice in the State of Illinois. (*Complaint*, ¶¶ 6-12). Mr. Musburger's professional corporation was Todd W. Musburger, Ltd., which was registered with the Illinois Secretary of State, but not with the Illinois Supreme Court under Rule 721. Neither Mr. Musburger nor Todd W. Musburger, Ltd. was licensed as an employment agency under the Illinois Private Employment Agency Act. (*Complaint*, ¶¶ 74, 160). Mr. Musburger was operating his law practice under the name, "The Law Offices of Todd W. Musburger, Ltd." (*Complaint*, ¶¶ 8,109-130).

For many years prior to 1998, Mr. Musburger had been Mr. Meier's "agent and exclusive legal representative for the negotiating and drafting of [his] agreements in the entertainment fields of radio and television, in exchange for a fee of five percent (5%) of the gross amount of any employment compensation and income payable to [him] under each such agreement." (*Complaint*, ¶12). In 1999, after Mr. Musburger had handled negotiations on plaintiff's behalf, plaintiff signed a new contract with WLS-AM, which was set to expire in February 2004.

Things went well until the summer of 2003 when it was time to negotiate a new deal. The plaintiff's co-host, Roe Conn, was represented by a different agent, and had a separate contract with the station. But it occurred to Mr. Meier and Mr. Musburger that they could secure the best terms

---

[3] We accept as true all the well-pled factual allegations of the Complaint.

in a new pact if plaintiff and Mr. Conn "present[ed] a unified front" in the upcoming negotiations. (*Complaint*, ¶16). Mr. Musburger drew up a proposed agreement to that effect for Mr. Conn's approval and sent it to his agent. Mr. Conn never signed the agreement, but whenever plaintiff asked Mr. Musburger about it, he assured him it "had been 'taken care of." (*Complaint*, ¶¶19-20).

On August 6, 2003, WLS-AM submitted a written proposal for a contract renewal for plaintiff, but he and Mr. Musburger concurred that the offer from Mr. Jones, the President and General Manager of WLS, was "truly insulting." (*Complaint*, ¶35). They also agreed that part of their strategy going forward would be to avoid contact with Mr. Jones. (*Complaint*, ¶¶23-22). Within two months, the plaintiff and Mr. Musburger were not to see eye-to-eye on anything.

**B.**
**A Rift Develops Between Mr. Meier And Mr. Musburger**

On September 4th, Mr. Musburger submitted a new fee agreement to plaintiff. It included several new provisions, the most troubling for the plaintiff being the following:

> (a) We may render similar services to others, including persons of the same general qualifications and eligibility for similar employment, and such representation shall not constitute a violation of our fiduciary or other obligations hereunder.

(*Complaint*, ¶25). Plaintiff refused to sign the new fee agreement. In fact, he left a voice mail for Mr. Musburger saying he "want[ed] to put everything on hold right now" and take a week or so to think things over. (*Complaint*, ¶¶26-27). He instructed Mr. Musburger not "to meet with anyone or have any further conversations with anyone," and to cancel any meetings regarding the WLS contract renewal that he might have scheduled. The plaintiff proposed that the two meet on September 23, 2003, to discuss things. (*Complaint*, ¶27). Plaintiff's wife also sent Mr. Musburger an email to the same effect. He later learned that, during the negotiations, Mr. Musburger was also

representing another talk show host, from another Chicago station, whom he suspects Musburger was attempting to seat in the plaintiff's chair beside Mr. Conn. (*Complaint*, ¶¶65-72).

Mr. Musburger responded to plaintiff's voice mail the next day with two letters, which he sent by messenger to the plaintiff. In the first, he reminded the plaintiff that he had a previously scheduled meeting about the new pact with Mr. Jones and Mike Packer, operations director at WLS-AM, that day and said that it was "evident that ABC is poised to finalize an agreement with us in the financial range that Garry is seeking. This would take the program to the highest level ever reached in Chicago radio." (*Complaint*, ¶29). He cautioned against the two-week delay proposed by Mr. Meier, but said he would be happy to meet on the 23rd of September. (*Id.*).

In the second letter, Mr. Musburger wrote that he was "mystified as to the reasons for the delay," and warned that negotiations – which he felt were nearing a conclusion – could be derailed by such a tactic. Mr. Musburger thought the plaintiff was deliberately avoiding having a conversation with him, and so he wondered whether plaintiff was considering terminating their relationship. He went on to laud the work that he had performed thus far:

> The energy put into this negotiation, which has involved multi-party interest in your show, balancing the restrictions in your present agreement, and finessing the always-difficult ABC management team is no small task. We have met these challenges head on and I can say unequivocally that the work for you has been performed with the highest degree of attention and professionalism, both with WLS and the competition. We have also eagerly advanced the interests of your on-air partnership wherever we could. I am very satisfied with and proud of the work that has been completed to date.

(*Complaint*, ¶30). If plaintiff wanted to terminate the agreement, Mr. Musburger explained that "all that would be required is for the work that has been completed, including the final steps that have been prepared, to be properly and fully compensated. These amounts are in addition to what is owed

for our work under your present ABC agreement." (*Id.*). He then mentioned that he had "other business with Zemira Jones scheduled for today" and could not reschedule. (*Id.*). Recall that his other letter indicated that he had a previously scheduled meeting about the plaintiff's contract. Mr. Musburger expressed concern that when he informed WLS-AM, and other stations with which he was speaking of the delay, it diminished their interest and negatively affected negotiations. (*Id.*).

Mr. Musburger, along with his son Brian, who was not a lawyer, went ahead with the meeting with Mr. Jones and Mr. Packer. He did not mention that plaintiff instructed him not to meet with them, but told them "that something very wrong was going on internally, and he, . . . was in trouble with [plaintiff]." (*Complaint*, ¶32). The group went on to discuss the specifics of a potential new deal for plaintiff, despite plaintiff's instructions. (*Complaint*, ¶33).

Plaintiff responded to Mr. Musburger's September 11 correspondence by letter on the 12th. He explained that he was not avoiding a personal conversation with him:

> What has happened is this. During our last telephone discussion you mentioned that you were sending an updated fee agreement. When Cynthia asked if you wanted to talk about it you declined. This written agreement was dated September 4, 2003 and Friday, September 5[th] and both Cynthia and I immediately called you to express our disappointment with both the document and the manner in which it was handled. Neither of us was able to speak with you personally and left voice messages.

(*Complaint*, ¶34). At some point, Mr. Musburger had apparently suggested that they just use the "old agreement." (*Id.*). It was then, according to the plaintiff, that he suggested taking a week off. He thought a new fee arrangement ought to have been discussed earlier, and not during what Mr. Musburger conceded was a sensitive period in their dealings with the station. (*Id.*).

The plaintiff went on to express concern that, despite their earlier agreement to avoid discussions with Mr. Jones, Mr. Musburger was meeting with him. Worse, he was revealing what

the plaintiff felt was confidential information. (*Complaint*, ¶34). The plaintiff was surprised that Mr. Musburger thought he was being terminated. The plaintiff also expressed surprise that Mr. Musburger was demanding compensation for the work he had already done, since the fee arrangement had been tied to a percentage of the plaintiff's remuneration under whatever contract Mr. Musburger *successfully* negotiated. (*Id.*). The plaintiff requested an explanation and an itemization of this demand. (*Id.*). He reiterated his request that Mr. Musburger refrain from meeting with WLS-AM principals, as well as his request for a meeting on September 23rd. (*Id.*).

Two days later, on the 13th, plaintiff's wife emailed Mr. Musburger. She echoed the plaintiff's concerns that Mr. Musburger was continuing to meet with radio station executives regarding the plaintiff's contract. And she questioned whether those meetings were as productive as Mr. Musburger claimed:

> You stated that ABC is "poised" to meet Garry's number. I can only assume, given the history of our involvement with Zemira, that you have those numbers in writing from ABC. Otherwise, I am hard pressed to believe that you could, in good faith, use the word "poised" in relationship to their current position, given that you yourself have said that you can't take Zemira's word for anything. . . . Therefore, if those numbers are in hand, please forward them to Garry and me immediately. If you do not have anything in writing from Zemira, Garry does not want you to now contact him, in light of our earlier requests.

(*Complaint*, ¶35). In closing, she asked Mr. Musburger for an email detailing the meeting, and indicated that the plaintiff was available to meet with him on September 23rd. (*Id.*).

Thereafter, the plaintiff alleges that Mr. Musburger had lengthy phone conversations with Mr. Conn's agent and Mr. Jones. He also again met with Mr. Jones, unbeknownst to plaintiff and against his wishes, on September 18, 2003. (*Complaint*, ¶¶41-42). Mr. Musburger's son, Brian, was also at that meeting. What Mr. Musburger did not do was respond to plaintiff's previous email. And

so, on September 22nd, the plaintiff sent him a long letter, complaining that he had been waiting for more than a week for details as to what occurred at Mr. Musburger's meeting with Mr. Jones and Mr. Packer on September 11th, despite having requested that information "immediately." (*Complaint*, ¶48). There had also been nothing "in writing" from the station; nothing to reveal the basis for Mr. Musburger's conclusion "that they were 'poised to finalize an agreement with [the plaintiff] in the financial range' which [he was] seeking." (*Id.*).

The plaintiff found this "unacceptable," and listed defects in Mr. Musburger's work including violating confidences and breaching fiduciary duties. He cancelled the September 23rd meeting, as it was "pointless," and terminated Mr. Musburger's services, although he indicated he would likely continue to pay him from the contract he had with WLS-AM, until it expired in February 2004. (*Id.*).

On January 23, 2004, Mr. Musburger sent the plaintiff a bill on Law Offices of Todd W. Musburger, Ltd. letterhead charging him for 170 hours of work at $475 per hour, and 40 hours of work at $300 per hour for a total of $92,750. (*Complaint*, ¶85). More on the name in a bit. The bill covered a period ending September 22, 2003. (*Complaint*, ¶85). The forty hours – representing $12,000 of the total – were logged by Mr. Musburger's son, Brian, "[f]or professional services," although Brian was not named in the bill. Brian was not an attorney, and, according to the plaintiff, he did not "perform substantial services." (*Complaint*, ¶ 101). There was never any agreement that Mr. Musburger would be charging the plaintiff for his son's time; in fact, when Brian appeared at a meeting, Mr. Musburger said he was "just learning the business." (*Complaint*, ¶¶92, 99, 100).

The plaintiff did not discover the details of the billing until depositions during the state court case. (*Complaint*, ¶95). The plaintiff also contends – indeed, it is a sore point with him – that the defendants were operating under the assumed name, the "Law Offices of Todd W. Musburger, Ltd."

(*Complaint*, ¶¶5, 8, 98, 113). According to the Complaint, which places inordinate emphasis on Mr. Musburger's use of this assumed name, the use of this designation enabled the defendants to obtain illegally large sums of money from the plaintiff. (*Complaint*, ¶¶ 8, 95, 108, 113).

## C.
## Mr. Musburger's Suit For Attorney's Fees In State Court

On April 1, 2004, Mr. Musburger sued Mr. Meier in state court to recover the $92,000 in fees he claimed he was entitled to for his efforts to negotiate the renewal of Mr. Meier's contract with WLS-AM. (*Complaint*, ¶56). In his complaint – brought under the name of "The Law Offices of Todd W. Musburger, Ltd." – Mr. Musburger said he spent well over 200 hours in negotiations, and was able to coax an offer of $12 million over ten years from WLS-AM. His complaint made no mention of the new fee agreement he sent the plaintiff – only the original agreement, whereby Mr. Musburger would receive five percent of plaintiff's salary and any expenses Mr. Musburger incurred on plaintiff's behalf. (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Ex. E). He charged plaintiff with breach of contract and sought recovery under a theory of *quantum meruit*.

At that time of the state court suit, plaintiff was still mired in negotiations with the radio station. Mr. Musburger attached as Exhibit A to his complaint, a complete copy of the plaintiff's 1999 WLS-AM contract, thereby making public the financial terms and conditions of his recently expired broadcast agreement. (*Complaint*, ¶57). The plaintiff submits that this was confidential information, and by revealing it to the public, Mr. Musburger violated the attorney-client privilege, not to mention Illinois Supreme Court Rules of Professional Conduct, Rule 1.6. (*Complaint*, ¶58). This disclosure made the local newspapers, and disrupted the plaintiff's negotiations, which, according to the Complaint, was exactly what Mr. Musburger intended. (*Complaint*, ¶¶60-63).

There was another disclosure: the reason why Mr. Musburger told the plaintiff WLS-AM was "poised" to give him what he wanted. During the state court case, Mr. Musburger testified under oath that at his September 18, 2003 meeting, WLS-AM orally communicated the substance of an offer to retain the plaintiff's "personal services for a period of ten (10) years, at an initial salary of $1.5 million to $1.6 million per year, with bonuses and a signing bonus." (*Complaint*, ¶49). According to the plaintiff, if Mr. Musburger had communicated the terms of that offer, he "would have given it the utmost serious consideration, and would, in all likelihood, have accepted such an offer." (*Complaint*, ¶51). Mr. Musburger never informed plaintiff of this oral offer; but at the same time, plaintiff does allege that as of September 13th, he instructed Mr. Musburger that he did not want to hear from him unless he had something in *writing*. (*Complaint*, ¶35).

In response to Mr. Musburger's complaint, Mr. Meier raised affirmative defenses that alleged that: (1) "The Law Offices of Todd W. Musburger, Ltd." was not a legal entity with the capacity to sue; (2) he had paid Mr. Musburger all fees due under their fee agreement, and the services for which he was seeking compensation were not provided pursuant to that agreement, (3) Mr. Musburger breached his fiduciary duty by representing clients whose interests conflicted with plaintiff, and sent plaintiff a new fee agreement dictating that he be allowed to do so – an agreement plaintiff refused to sign; and (4) Mr. Musburger violated his fiduciary duties by failing to follow plaintiff's instructions regarding refraining from contact with Zemira Jones, continuing to meet with WLS-AM principals despite plaintiff's instruction not to, and failing to provide information regarding negotiations and contract offers when plaintiff requested. Plaintiff also filed a counterclaim alleging breach of fiduciary duty, intentional infliction of emotional distress – because Mr. Musburger had attached plaintiff's 1999 contract with WLS-AM to his state court complaint – and public disclosure

of private facts. (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Ex. F).

As the state court case progressed, plaintiff ultimately filed a Third Amended Counterclaim that charged Mr. Musburger with professional negligence stemming from Mr. Musburger's failure to finalize the "unified front strategy" and failing to keep plaintiff adequately informed of what occurred in that regard (Count I); breach of fiduciary duty for disobeying plaintiff's directives following Mr. Musburger's proposal of a new fee arrangement (Count II); professional negligence stemming from Mr. Musburger's failure to disclose WLS-AM's new offer to plaintiff (Count III); public disclosure of private facts for attaching the prior pact between plaintiff that the radio station to his state court complaint (Count IV); breach of fiduciary duty stemming from representing another client with interests in conflict with plaintiff's (Count V); breach of fiduciary duty for excessive, improper, and fraudulent billing (Count VI). (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Ex. G). Plaintiff also sought leave to file a third party complaint against Brian Musburger, alleging that he breached his fiduciary duties, impermissibly split fees with a lawyer, charged for services that plaintiff did not consent to, and overcharged for his services. (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Ex. H). The trial court denied plaintiff leave to file his third party complaint, but struck Count VI of the Third Amended Counterclaim because after Mr. Musburger was terminated, he no longer had any fiduciary duties to plaintiff. (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Ex. I).

On the eve of the January 23, 2007 trial, plaintiff filed a motion to dismiss Mr. Musburger's complaint and sought leave to file a fourth amended counterclaim and a fifth affirmative defense, both of which relied on plaintiff's assertion that Mr. Musburger acted as an employment agency without registering, in violation of the Illinois Private Employment Agency Act. (*Memorandum in*

*Support of Defendants' Motion to Dismiss*, Ex. I; K). After a hearing on January 22, 2007, the court dismissed this claim on the merits, finding that Mr. Musburger's law office was not acting as an employment agency as envisioned by the Private Employment Agency Act. (*Id.*, Ex. L, at 17-18). Next, Mr. Meier voluntarily dismissed his remaining counterclaims.

After a week-long trial in the Circuit Court of Cook County at the end of January 2007, the jury awarded Mr. Musburger $68,750 on the single count remaining at issue – Mr. Musburger's *quantum meruit* claim. (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Ex. M). Plaintiff filed a motion to vacate the judgment, arguing that there was no record of any registration for "Law Offices of Todd W. Musburger, Ltd." with the Illinois Supreme Court Clerk's Office to practice law, with the Illinois Secretary of State as a corporation, or with the County Clerk's office as a business, meaning it was a non-entity without the capacity to sue. (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Ex. P). The trial court denied the motion, accepting Mr. Musburger's argument that this was merely a technical defect. (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Exs. Q, R). Plaintiff then filed a post-trial motion, attacking the jury verdict on various grounds, which was denied on September 26, 2007.

On November 8, 2007, Mr. Meier appealed, and that appeal is still pending. (*Memorandum of Law in Support of Defendants' Motion to Dismiss*, Ex. O). [4]

---

[4] Mr. Meier's counsel has represented that the record on appeal in the state court case has been lost and that neither he nor the Clerk of the Circuit Court of Cook County has thus far been able to reconstruct the record, although he is confident that will occur at some point.

**D.**
**The Federal Case**

Plaintiff waited all of two months after filing the notice of appeal in the state case, before instituting the instant case on January 9, 2008. The Complaint charges the defendants – one of whom is Mr. Musburger's son – with a substantive RICO violation (Count I) and with RICO conspiracy (Count II). The remaining 26 counts purport to charge legal malpractice for failing to follow through with Mr. Conn executing the "unified front" agreement (Count III), breach of fiduciary duty for failing to follow his directives regarding meetings with WLS-AM executives and providing details of those meetings (Count IV), legal malpractice for failing to disclose WLS-AM's oral offer (Count V), public disclosure of private facts (Count VI), breach of fiduciary duty and conflict of interest for representing another talk-show host concurrently with plaintiff (Count VII), fraud stemming from billing for Brian's services as an attorney (VIII), violating the Private Employment Agency Act, which requires an employment agency or counselor to be licensed by the state's department of labor before charging a fee for their services (Count IX), legal malpractice for suing plaintiff to recover for Brian's services (Count X), fraud and deceit (Count XI), violating the Illinois Attorneys Act (Count XIII), violating the Illinois Consumer Fraud and Deceptive Business Practice Act for acting without license as an employment agency (Count XV), violating the Illinois Antitrust Act by requiring plaintiff to have exclusive representation (Count XVI), and unjust enrichment (Count XVII). In addition, the plaintiff seeks: a declaratory judgment that all contracts between the parties were void *ab initio* (Count XII), "Recession" [sic] (Count XIV), and to pursue his claims as part of a class action (Count XVIII).

The Illinois statutory and common law claims were advanced in the state court case either

as affirmative defenses or counterclaims. Indeed, a comparison of the federal complaint with the state court pleadings – the Third Amended Counterclaim, the proposed Third Party Complaint against Brian Musburger, and the Petition to Vacate the Judgment – suggests virtual identity, although there was some immaterial shuffling of paragraphs and a bit of editing between state and federal pleadings. But there had to be federal jurisdiction as well, so to get into federal court while his appeal of the state court judgment is pending, the plaintiff added Counts I and II under RICO, 18 U.S.C. § 1961, *et seq.* Presto, federal question jurisdiction under 28 U.S.C. § 1331.

Unfortunately for the plaintiff, federal jurisdiction depends on more than artful pleading, and neither labels, conclusions, nor a formulaic recitation of the elements of 18 U.S.C. §1961, *et seq.* will suffice to create a RICO claim or otherwise to establish federal jurisdiction. *See Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). As we shall see, the complaint fails to state a claim under RICO – indeed it demonstrates that there can be no viable RICO claim – and thus, there is no jurisdiction under 28 U.S.C. § 1331. Consequently, following the counsel of *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003), I decline to exercise supplemental jurisdiction over Mr. Meier's state law claims under 28 U.S.C. § 1367(a).

## II.
## ANALYSIS

### A.
### The *Rooker-Feldman* Doctrine Does Not Apply In This Case

The *Rooker-Feldman* doctrine derives its name from two Supreme Court decisions decided sixty years apart: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). It is a jurisdictional bar that prohibits federal district courts from reviewing final state court judgments. It springs from the principle that district courts

15

have only original jurisdiction;[5] the Supreme Court alone has appellate jurisdiction over state court judgments. *Kelley v. Med-1 Solutions, LLC*, _F.3d_, 2008 WL 4977590 (7th Cir. 2008). Although a simple concept at its core, the Circuit Courts of Appeals have diverged in their application of *Rooker-Feldman*.

Much of the trouble has stemmed from the natural tendency to equate *Rooker-Feldman* with preclusion principles and how to decide which claims were "inextricably intertwined" with state court judgments, language first introduced in *Feldman*. In 2005, the Supreme Court narrowed the scope of *Rooker-Feldman* in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005). Concluding that many of the Circuits had expanded the doctrine beyond its original meaning, the Supreme Court emphasized the doctrine's limited application, despite failing to explain "inextricably intertwined." *Id.* at 283-84. But the Seventh Circuit had always interpreted the doctrine narrowly. In *GASH Assocs. v. Village of Rosemont, Ill.*, 995 F.2d 726 (7th Cir. 1993)(Easterbrook, J.), the court formulated a test to determine if *Rooker-Feldman* applies:

> [I]s the federal plaintiff seeking to set aside a state judgment, or does he present some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party? If the former, then the district court lacks jurisdiction; if the latter, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.

*Id.* at 728. The court was careful to distinguish between *Rooker-Feldman* and preclusion. *Id.* It noted that while equating the two was natural, preclusion of federal litigation following a state court judgment rests on the Full Faith and Credit Statute, 28 U.S.C. § 1738. *Id.* Preclusion requires federal courts to give state court judgments the same effect as another state court would. *Id.*

---

[5] The exception to Congressional mandate that district courts only have original jurisdiction is that federal district courts may review *habeas corpus* claims brought by state prisoners. 28 U.S.C. § 2254.

The court stressed that "[t]he *Rooker-Feldman* doctrine...has nothing to do with § 1738. It rests on the principle that district courts have only original jurisdiction; appellate jurisdiction over judgments of state courts in civil cases lies in the Supreme Court of the United States, and parties have only a short time to invoke that jurisdiction." *Id. GASH's* test for the application of the *Rooker-Feldman* doctrine echoes throughout the Seventh Circuit case law on the subject: the state court judgment must have caused the injury, not the federal plaintiff's adversary. *See e.g., Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir. 1996); *Long v. Shorebank Development Corp.*, 182 F.3d 548, 555 (7th Cir. 1999); *General Auto Service Station LLC v. City of Chicago*, 319 F.3d 902, 905 (7th Cir. 2003).

The test is easily applied here and with obvious results. *Rooker-Feldman* requires that the complained of injury derive from the state court judgment, itself. Since, none of the counts in the federal complaint stems from or attacks the state court judgment, the doctrine does not apply here. As Defendant correctly points out, each of plaintiff's claims are identical to or variations of his affirmative defenses, counterclaims, or an issue raised in his Petition to Vacate the Judgment in the state court proceedings. (*Defendants' Motion to Dismiss*, at 6-7). Plaintiff's two RICO claims – the only reason he is in federal court in the first place – are clearly directed at the same universe of facts involved in the state court claims.

As further proof that the claims are independent of the state court judgment, the majority of Mr. Meier's alleged injuries took place between 1998 and September 22, 2003, more than six months before Mr. Musburger filed his complaint in state court on April 1, 2004. The rest of his claims are a result of Mr. Musburger's actions during the state court proceedings, namely that Mr. Musburger made public privileged information when he attached the 1999 WLS/Meier contract to his state court

17

complaint. (*Complaint*, ¶¶ 57-63).

Plaintiff's unhappiness with the outcome of the state court case underlies his obvious efforts to bypass the adverse judgment by artful pleading–a gambit that courts in all circumstances refuse to countenance.[6] But that attempted end-around does not trigger *Rooker-Feldman's* bar of federal jurisdiction, which would occur if there were an attack on the state court's judgment. The court's observation in *Zurich American Insurance Co. v. Superior Court for the State of California*, 326 F.3d 816, 822 (7th Cir. 2002) is applicable here: "[plaintiff's] injury was not caused by the state court, but by its adversary's conduct . . .; its only gripe with the state court is that it failed to remedy that conduct. . . .[plaintiff's] federal claim simply seeks to bypass the state court's order, and does not directly attack it, so *Rooker-Feldman* does not apply." His injury did not result from the state court judgment – *e.g*, a confirmation of a sale of property or a decision not to award parental custody – he suffered an injury at the hands of his adversary and failed to obtain relief from state court. *See Garry*, 82 F.3d at 1366 (explaining the critical difference between failing to obtain relief from the state court and suffering an injury from the state court judgment).

The same is true here. Mr. Meier's claimed injuries occurred long before he lost in the state court, and it is those injuries and the conduct he claims caused them for which he seeks recompense. Therefore, the *Rooker-Feldman* doctrine does not apply, and we turn to the merits.

---

[6] *See e.g.,Block v. North Dakota ex rel. Bd. of University and School Lands,* 461 U.S. 273, 285 (1983); *Hays v. Bryan Cave, LLP*, 446 F.3d 712, 713 (7th Cir. 2006); *Sims v. EGA Products, Inc.*, 475 F.3d 865, 867 (7th Cir. 2007); *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1391 (7th Cir. 1990)(Posner, J., concurring); *Parmelee Transportation Co. v. Keeshin*, 292 F.2d 794, 804 (7th Cir. 1961), *cert. denied*, 368 U.S. 972 (1962).

**B.**

**The Complaint Does Not State A Claim Under RICO**

**1.**

**To Survive A Motion To Dismiss, A Complaint Must State
A Plausible, Not Merely A Conceivable Claim**

In opposing the motion to dismiss the RICO counts, the plaintiff argues that "'[a] complaint

should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff

can prove no set of facts which would entitle him to relief.'" (*Memorandum in Opposition to Motion*

*to Dismiss*, at 5). The difficulty is this is the standard the Supreme Court set forth fifty years ago in

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), but interred in *Bell Atlantic Corp. v. Twombly*, 550

U.S. 544, 127 S.Ct. 1955, 1969 and n.8 (2007), eight months before Mr. Meier filed this case.

Under *Bell Atlantic*, a complaint must allege "enough facts to state a claim to relief that is

plausible on its face." *Id*. at 1974. While *Bell Atlantic* "must not be overread" as supplanting the

basic notice-pleading standard, *id.* at 1973, n. 14 (disclaiming the establishment of any "heightened

pleading standard"); *accord Tamayo v. Blagojevich*, 526 F.3d 1074, 1082 -1083 (7th Cir. 2008), it

must not be underread to ignore the fact that the opinion "teaches that a defendant should not be

forced to undergo costly discovery unless the complaint contains enough detail, factual or

argumentative, to indicate that the plaintiff has a substantial case." *Limestone Development Corp.*

*v. Village of Lemont, Ill.*, 520 F.3d 797, 802-03 (7th Cir. 2008). Here is how Judge Posner's panel

opinion in *Limestone Development* put it:

> Under *Bell Atlantic*, the complaint in a potentially complex litigation, or one that by
> reason of the potential cost of a judgment to the defendant creates the "in terrorem"
> effect against which *Blue Chip* warned, must have some degree of plausibility to
> survive dismissal. It is true that the narrowest holding in *Bell Atlantic* is merely that
> an antitrust complaint charging an agreement between firms not to compete must
> contain "enough factual matter (taken as true) to suggest that an agreement was made

... But the concern is as applicable to a RICO case, which resembles an antitrust case in point of complexity and the availability of punitive damages and of attorneys' fees to the successful plaintiff. RICO cases, like antitrust cases, are "big" cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim.

520 F.3d at 803. *Accord, Tamayo,* 526 F.3d at 1083. The Complaint fails the plausibility test – and rather badly.

## 2.
## The Structure And Purpose Of RICO

We begin with an outline of RICO's provisions. RICO created a civil cause of action for any person "injured in his business or property by reason of a violation of section 1962." *See* 18 U.S.C. § 1964(c). Section 1962, in turn, consists of four subsections: Subsection (a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Section 1961(1) contains an exhaustive list of acts of "racketeering," commonly referred to as "predicate acts." This list includes mail and wire fraud, which are arguably charged as acts of racketeering by the Complaint.[7]

Subsection (b), insofar as relevant here, makes it "unlawful for any person through a pattern of racketeering activity... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Subsection (c) makes it "unlawful for any person employed by or associated with any enterprise

---

[7] Section 1961(4) defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." Pattern of racketeering activity requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years after the commission of a prior act of racketeering activity. 18 U.S.C. §1961(5). Finally, subsection (d) makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)...." [8]

Congress passed RICO in an effort to combat organized, long-term criminal activity. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 242 (1989); *Midwest Grinding Co., Inc. v. Spitz,* 976 F.2d 1016, 1019 (7th Cir.1992). Even though Congress never intended that the statute be employed to allow plaintiffs to turn garden-variety state law fraud and breach of fiduciary duty cases into RICO claims, *Jennings,* 495 F.3d at 472; *Gamboa v. Velez,* 457 F.3d. 703, 707 (7th Cir. 2006), from the beginning, the breadth of RICO's text and the lure of treble damages and attorneys' fees proved irresistible to those bent on federalizing such claims. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 499, n. 16 (1985); *Morgan v. Bank of Waukegan,* 804 F.2d 970, 973 (7th Cir. 1986). Thus, plaintiffs have tried – unsuccessfully – to wedge every manner of ordinary dispute into a RICO case. The reported cases run the gamut from a delivery of damaged furniture, *Pizzo v. Bekin Van Lines Co.,* 258 F.3d 629, 633 (7th Cir. 2001); to a breach of a computer leasing agreement, *Mendelovitz v. Vosicky,* 40 F.3d 182 (7th Cir. 1994), to poaching customers from a competitor, *Midwest Grinding Company, Inc. v. Spitz,* 976 F.2d 1016 (7th Cir.1992), to – as here – a dispute over

---

[8] According to Mr. Meier's counsel in a letter sent to the court, Count I was intended to charge violations of §§ 1962(b) and (c)

attorney's fees. *McDonald v. Schencker*, 18 F.3d 491 (7th Cir. 1994). A few plaintiffs have trafficked in more exotic fare: a compulsive gambler complaining about a casino's promotional mailings, *Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294 (7th Cir.2003), or a track star's dispute of a failed drug test. *Slaney v. The Intern. Amateur Athletic Federation*, 244 F.3d 580 (7th Cir. 2001). But like more routine attempts to manufacture federal jurisdiction, the Seventh Circuit has not taken kindly to them. *Aztar Ind. Gaming*, 351 F.3d at 299-300.

To prevent RICO from being misused as a vehicle for federalizing state court fraud claims, the courts sought to limit RICO's seemingly limitless reach. Perhaps the most prominent restriction stems from the Supreme Court's recognition that seldom can a pattern of racketeering activity consist of two separate acts or racketeering. *H.J., Inc.*, 492 U.S. at 236, *et seq., Gamboa*, 457 F.3d at 710; *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1008 (7th Cir. 2004).

### 3.
### Count I Does Not Adequately Allege A Pattern Of Racketeering Activity

Taken in a light most favorable to the plaintiff, the Complaint charges a scheme that consists of: 1) non-registration with the Illinois Department of Labor by Mr. Musburger and his son as an employment agency under the Illinois Private Employment Act; 2) use of the name, "The Law Offices of Todd W. Musburger, Ltd."; 3) an unsuccessful, attempted breach of fiduciary duty in September 2003 when Mr. Meier was asked to sign an agreement allowing Mr. Musburger to simultaneously represent a competing talk show host; and 4) an unsuccessful, attempted breach of fiduciary duty by Mr. Musburger when, a few months later, he submitted a bill for legal services that was allegedly excessive and included time for the services of his son who was not a lawyer. The facts underlying the supposed scheme to defraud are set forth in 133 paragraphs spanning 40 pages. This is an

extraordinary amount of detail under any circumstances, but it is especially so since the duration of claimed racketeering activity – perhaps the closest thing we have to a brightline continuity test, *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 780 (7th Cir. 1994) – covers a period of four to six months. That is an insufficient duration to show a pattern or to pose the kind of threat of continuing activity that RICO was designed to combat.

a.

To state a claim under either §1962(b) or (c), a plaintiff must adequately plead a "pattern of racketeering activity." *H.J. Inc.*, 492 U.S. at 238. Indeed, "'the heart of any RICO complaint is the allegation of a *pattern* of racketeering.'" *Rotella v. Wood*, 528 U.S. 549, 556 (2000)(Emphasis in original). While §1961(5) defines a pattern of racketeering activity as consisting of at least two predicate acts of racketeering committed within a ten-year period, *Jennings*, 495 F.3d at 472; *Midwest Grinding*, 976 F.2d at 1019, two of anything seldom make out a pattern. In the context of RICO, courts carefully scrutinize the pattern requirement in order to curb "widespread attempts to turn routine commercial disputes into civil RICO actions," to "forestall RICO's use against isolated or sporadic criminal activity, and to prevent RICO from becoming a surrogate for garden-variety fraud actions properly brought under state law." *Midwest Grinding*, 976 F.2d at 1022.

To fulfill the pattern requirement, plaintiffs must satisfy "the so-called 'continuity plus relationship' test: the predicate acts must be related to one another (the relationship prong) and pose a threat of continued criminal activity (the continuity prong)." *Id.* (citing *H.J., Inc.*, 492 U.S. at 239); *Jennings*, 495 F.3d at 473. The "relationship" requirement often proves uncontroversial. *See, e.g., Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1048 (7th Cir. 1998); *Vicom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 779 (7th Cir. 1994). While the Complaint inexactly

23

and incorrectly refers to the use of the "wires and U.S. mail" as the vehicles by which the "racketeering activity" was "accomplished" (¶ 136), 18 U.S.C. §§ 1341, 1343, are never referred to.[9] Instead, money laundering, 18 U.S.C. §§ 1956(a)(1)(A)(I); (B)(ii), is explicitly charged to as the racketeering activity. (¶ 135). Curiously, the plaintiff's brief in opposition speaks only of mail and wire fraud. (*Plaintiff's Memoranda*[sic] *in Opposition*, at 24-25).

Although it is left unaddressed by plaintiff, one could assume that these predicate acts were related because they all had the purpose of advancing a scheme to charge plaintiff for representation while the defendants' had a conflict of interest and were unregistered under an Illinois regulatory statute governing private employment agencies. *See H.J. Inc.*, 492 U.S. at 240 (predicate acts of racketeering satisfy the relationship test if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events).

The "continuity" requirement is another matter. In *Morgan v. Bank of Waukegan*, 804 F.2d 970 (7th Cir.1986), the Seventh Circuit held that the factors relevant to determining whether there is continuity "include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." 804 F.2d at 975. *See also RWB Services, LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 688 (7th Cir. 2008); *Jennings*, 495 F.3d at 473. Here, the Complaint has alleged one victim, one scheme, one injury and very few predicate acts: money laundering, and no more than a few candidates for what might be mail or wire fraud. (*Complaint*, ¶¶ 25, 29, 30, 37, 40). And, as

---

[9] This allegation makes no sense, for the mailings or wirings *are* the racketeering activity, not the means for accomplishing it.

we shall see, even those few allegations are inadequately stated.

So the complaint fails in terms of number of predicate acts, number of schemes, number of victims, and number of injuries. In the continuity analysis, that leaves only the length of time of the claimed racketeering activity. Continuity can be "both a closed- and open-ended concept." *Midwest Grinding*, 976 F.2d at 1022 (quoting *H.J., Inc.*, 492 U.S. at 241); *Jennings*, 495 F.3d at 473. Closed-ended continuity "refers to criminal behavior that has come to a close, but endured for such a substantial period of time 'that the duration and repetition of the criminal activity carries with it an implicit threat of continued criminal activity in the future.'" *Jennings*, 495 F.3d at 473 (quoting *Midwest Grinding*, 976 F.2d at 1022-23). Open-ended continuity, on the other hand, is "'a course of criminal activity which lacks the duration and repetition to establish continuity.'" *Jennings*, 495 F.3d at 473 (quoting *Midwest Grinding*, 976 F.2d at 1023). *See also Corley*, 142 F.3d at 1048; *Roger Whitmore's Auto. Services, Inc. v. Lake County, Illinois*, 424 F.3d 659, 674 (7th Cir. 2005). The Complaint provides no clue as to which type of continuity it has in mind. Consequently, it must be examined in terms of both.

It is immediately apparent that plaintiff cannot be alleging a pattern of racketeering activity with open-ended continuity. Schemes with a "clear and terminable goal have a natural ending point." *Roger Whitmore's Auto. Services, Inc.*, 424 F.3d at 674; *Gamboa*, 457 F.3d. at 707. That's what plaintiff has alleged here: he says his attorney billed him exorbitantly while representing a competing talk show host without his permission, and running afoul of a claimed (but inapplicable) registration requirement under the Private Employment Agency Act. But once plaintiff terminated the defendants as his representatives, the "scheme" was at an end. And if not then, surely it ended a short time later when the final bill was received.

25

*McDonald v. Schencker*, 18 F.3d 491 (7th Cir. 1994) demonstrates the futility of any attempt to make this a RICO case. In *McDonald* a disgruntled client, sued her lawyer for allegedly excessive billing and unethical conduct in converting money that was being held in escrow by the defendant. In affirming the dismissal of the complaint, the court of appeals pointed to a number of deficiencies, all of which exist in this case as well. First, the court emphasized that two acts of racketeering activity, while necessary to make a pattern, are normally not sufficient, *id.* at 493, 497, for "in common parlance, two of anything do not generally form a 'pattern.'" *Sedima*, 473 U.S. at 497, n. 14. It went on to note that even if a pattern of racketeering activity had been sufficient pled, the complaint "utterly failed to demonstrate how [defendants'] actions posed a threat of continuing future criminal acts against McDonald." 18 F.3d at 494. Finally, the court of appeals held that a scheme or artifice to defraud under the mail or wire fraud statutes is not satisfied by merely alleging unethical conduct by a lawyer. *Id.* at 495, n.3. *See also Diaz v. The Paul J. Kennedy Law Firm*, 289 F.3d 671 (10th Cir. 2002)(affirming dismissal of RICO complaint brought by a client dissatisfied with his lawyer's representation and billing); *Britt v. Fox*, 110 Fed.Appx. 627 (6th Cir. 2004)(same).

The similarities between this case and *McDonald* are striking: Mr. Meier fired his attorney on September 22, 2003. "[S]o that takes care of the threat of repetition on [Mr. Musburger's part]." 18 F.3d at 498. The kind of misconduct alleged in the Complaint is analytically indistinguishable from that in *McDonald* as both involved claimed breaches of the fiduciary duty owed by a lawyer to his client. Indeed, in the instant case, the Complaint uses the phrases, "breach of fiduciary duty" or some variant at least fourteen times And, as in *McDonald* and *Roger Whitmore's*, "[plaintiff] pleaded himself out of showing a continuing threat of continued activity, because the alleged scheme had a natural ending point...." *Roger Whitmore's*, 424 F.3d at 674. Instead, plaintiff's "allegations

at best constitute[] 'the type of short-term, closed-ended fraud that, subsequent to *H.J.*, this circuit consistently has held does not constitute a pattern.'" *Jennings*, 495 F.3d at 474 (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 922 (7th Cir.1992)). There is absolutely nothing in the Complaint to suggest the threat of continuing criminal behavior that RICO was designed to combat.

Plaintiff fares no better with regard to alleging a pattern of racketeering activity with closed-ended continuity. In such instances, the criminal activity must generally have gone on for a substantial period of time. The duration of the alleged racketeering activity is "'perhaps the most important element of RICO continuity.'" *Jennings*, 495 F.3d at 473-74. The first "predicate act" of mail fraud is alleged to have occurred on September 4, 2003, when the defendants sent plaintiff the new fee agreement ostensibly absolving them of any conflict of interest. (*Complaint*, ¶¶ 14, 25). The plaintiff fired the defendants on September 22, 2003. (*Complaint*, ¶ 48). The scheme arguably ended then. The mailing of the bill – a predicate act in furtherance of the alleged scheme – occurred four months later on January 23, 2004. (*Complaint*, ¶¶ 84-85). Either way, the period of the scheme is simply too short to show the necessary continuity for a pattern of racketeering activity. *See Jennings*, 495 F.3d at 474 (measuring relevant period from first alleged instance of mail/wire fraud to last). Even if the defendants' filing of its lawsuit to collect on the bill in April 2004 (*Complaint*, ¶ 56) is factored in, which it should not be, the period is still only a little more than six months.[10]

---

[10] The Complaint contains no allegation of any racketeering acts associated with this aspect of the purported scheme. It is the duration of those acts, not the existence of a scheme, *simpliciter*, that counts for pattern purposes. *See H.J., Inc.*, 492 U.S. at 241-42; *Jennings*, 495 F.3d at 473 (in determining continuity, relevant factors include the length of time over which the alleged predicate acts were committed"); *Williams*, 351 F.3d at 298 (plaintiff must show continuity plus relationship with respect to the alleged predicate acts); *Corley*, 142 F.3d at 1049; *Vicom*, 20 F.3d at 780 ("this court has placed great importance on the length of time the alleged predicate acts have spanned."). Thus, even if Mr. Musburger should have registered under the Illinois Private Employment Agency Act and even if that failure could be deemed a component of a scheme to defraud, the fact remains that the alleged predicate acts of mail and wire fraud only span a period
(continued...)

The cases are quite consistent in holding that racketeering activity having this kind of a brief duration generally will not satisfy RICO's pattern requirement. *See e.g., Jennings*, 474 (ten months period too short); *Midwest Grinding*, 976 F.2d at 1024 (a nine-month period insubstantial); *Olive Can Co. v. Martin*, 906 F.2d 1147, 1151 (7th Cir. 1990)(six months to be a "short period of time"); *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 922 (7th Cir.1992)(predicate acts lasting at most seven to eight months was "precisely the type of short-term, closed-ended fraud that, subsequent to *H.J., Inc.,* this circuit consistently has held does not constitute a pattern."); *J.D. Marshall Intern., Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991)(13 months and relating to a single scheme with a single victim); *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3rd Cir.1991) ("Twelve months is not a substantial period of time."); *Primary Care Investors Seven, Inc. v. PHP Healthcare Corp.*, 986 F.2d 1208, 1215 (8th Cir.1993) (activity lasted between 10 and 11 months; " we deem this period insubstantial"); *Lipin Enterprises v. Lee*, 803 f.2d 322 (7th Cir. 1986)(predicate acts spanning "several months" and relating to the same transaction did not constitute a pattern).

Of course, there is no algorithmic test against which to measure the duration of criminal activity. Criminal activity lasting only several months may be enough to satisfy the pattern requirement. *See e.g., Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271 (7th Cir.1989)(single scheme lasting over a four-month period); *Liquid Air*, (single scheme over seven months). The same is true where a complaint alleges that the racketeering activity affected only a single victim, *see e.g., Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 115 F.3d 1332 (7th Cir. 1997); *Uniroyal Goodrich*

---

[10](...continued)

of four to six months. Hence, the only arguable pattern of racketeering activity did not begin until about September 2003, even if the purported scheme began when Mr. Musburger first began dealing with Mr. Meier years earlier.

*Tire Co. v. Mutual Trading Corp.*, 63 F.3d 516, 523-24 (7ᵗʰ Cir. 1995), or where only a single scheme is alleged. *Morgan v. Bank of Waukegan, supra.* In these, and similar cases the complaint sufficiently stated a claim under RICO because there were multiple separate and distinct injuries and the threat of criminal activity "continue[d] to manifest itself over time and thus pose[d] a special threat to society." *Morgan*, 804 F.2d at 978 (Ripple, J., concurring).

The standard is fact-dependent and requires a careful case-by-case analysis, *Morgan*, 804 F.2d at 977, the goal of which is to achieve "'a natural and common sense result consistent with Congress's concern with long-term criminal conduct.'" *Jennings*, 495 F.3d at 473.

In the instant case, that analysis leads to the firm conclusion that the Complaint affirmatively demonstrates an absence of the necessary "continuity"– closed- or open-ended – for there to be a finding that there was a pattern of racketeering activity. Consequently, Count I must be dismissed. *See Gamboa*, 457 F.3d at 710-11(accepting interlocutory appeal and reversing denial of motion to dismiss where plaintiff failed to adequately allege continuity aspect of patten of racketeering).

Stripped to its essentials, the complaint charges nothing more than a short-lived dispute between Mr. Meier and Mr. Musburger over his legal representation and the legal fees that Mr. Meier was charged. This is not the kind of conduct that RICO was designed to combat.

**b.**

Although the Complaint includes at the end a class action allegation, it is based on "information and belief" that "their[sic] exists a class of other persons who have likewise been subject to payment of large salary and or income commissions for Defendants' procurement of employment . . . ." (*Complaint*, ¶ 179). But such speculative, general allegations do not pass muster. The Seventh Circuit has "repeatedly held that a plaintiff's conclusory allegations that 'defendants'

29

also defrauded unidentified 'others' are not enough to plead the requisite pattern of fraud." *Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 729 (7th Cir. 1998). *See also Jennings*, 495 F.3d at 466 ("unspecific assertions" regarding "a vast array of victims" "are inadequate").

In *Emery v. American General Finance, Inc.*, 71 F.3d 1343 (7th Cir.1995), the court was clear about the need for specificity:

> The plaintiff pleaded with adequate particularity the fraud directed against her, but with regard to other customers . . . alleged merely that the company did the same thing to them. There are no names or dates or other details of transactions involving any other customers besides [plaintiff]. These details ... are necessary to identify a violation of RICO, which requires ... more than one fraud and only one is alleged to have been perpetrated against [plaintiff] herself.

71 F.3d at 1348.

### 4.
### Count I Does Not Adequately Allege Predicate Acts

#### a.
#### The Mail and Wire Fraud Allegations

Given the breadth of the mail and wire fraud statutes, 18 U.S.C. §§1341, 1343, mailings and wirings have always been favored predicate acts in cases like this where ordinary disputes are sought to be transformed into RICO claims. *See Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 149 (1987). And it is that very breadth that has caused judicial concern that the statutes not be given too vague and encompassing a scope – especially in a civil RICO context. *Emery*, 71 F.3d at 1346. That makes them a not-so-favored means as far as the Seventh Circuit is concerned. *See Roger Whitmore's*, 424 F.3d 673; *Vicom*, 20 F.3d at 781 (collecting cases). Predictably, the Complaint seems to mention mail and wire fraud as possible predicate acts. (*Complaint*, ¶136; *Memorandum in Opposition to Motion to Dismiss*, at 24). But the existence of

even multiple mailings or wirings does not mean that there is a pattern of racketeering activity:

> [RICO] plaintiffs are mistaken to emphasize the raw number of mail and wire fraud violations. Some of the present uncertainty over the pattern element stems from such arguments which depend upon the unusual nature of these two most commonly alleged RICO predicate acts.... In mail and wire fraud, each mailing or interstate communication is a separate indictable offense, even if each relates to the same scheme to defraud, and even if the defendant did not control the number of mailings or communications. Thus, the number of offenses is only tangentially related to the underlying fraud, and can be a matter of happenstance.

*Pizzo*, 258 F.3d at 632-33 (quoting *Ashland Oil*, 875 F.2d at1278 )(internal citations omitted)).

As already noted, the Complaint alleges relatively few instances of mail and wire fraud. "The fairly small number of predicate acts cuts against showing continuity, particularly when a large proportion of the acts involved wire or mail fraud, neither of which are favored means of establishing a RICO pattern in this circuit." *Roger Whitmore's*, 424 F.3d at 673. Thus, even if the plaintiff came up with a much longer list of instances of mailings and/or wirings, it would be unavailing, for even the few instances alleged are pled insufficiently and without the requisite particularity demanded by Rule 9(b). *Slaney*, 244 F.3d at 599; *Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 784 (7th Cir. 1999); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726 (7th Cir.1998). Rule 9(b) requires that a RICO plaintiff must allege the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff. *Slaney*, 244 F.3d at 599; *Lachmund*, 191 F.3d at 784; *Goren*, 156 F.3d at 726. Each alleged use of the mails or wires must satisfy the requirements of Rule 9(b). *Slaney*, 244 F.3d at 599; *Emery v. American Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir.1998).

There are only four candidates for "mailings" among the 133 paragraphs purportedly

detailing the "scheme." (*Complaint*, ¶¶ 18, 25, 29, 30, 84). First, there is the new agreement that Mr. Musburger wanted plaintiff to sign:

> . . . on September 4, 2003, TODD W. MUSBURGER, LTD. sent a new fee agreement to METER that contained several new provisions, including the following language:
>
> (a) We may render similar services to others, including persons of the same general qualifications and eligibility for similar employment, and such representation shall not constitute a violation of our fiduciary or other obligations hereunder.

(*Complaint*, ¶ 25). Strikingly, there is no misrepresentation. If anything, the fee agreement revealed far too much to the plaintiff. Instead of misleading him, the new agreement was an alarm bell, and he refused to sign it. (*Complaint*, ¶ 25). Indeed, this mailing provided the impetus for plaintiff to first distance himself from Mr. Musburger and then to fire him two-and-a-half weeks later. (*Complaint*, ¶¶ 27-48).

Thus, the mailing did nothing to further the scheme that plaintiff alleges he fell victim to — it scuttled it. "A mailing that is not in furtherance of the fraud, but instead works against it will not support a mail fraud conviction. Case law suggests that, in the context of mail fraud on an insurer, a mailing does not further the illegal scheme, and thus is outside the statute, when it serves to put the defrauded person on notice of the fraud, makes the execution of the fraud less likely, opposes the scheme, or discloses the nature of the fraud." *United States v. Koen*, 982 F.2d 1101, 1107 (7th Cir. 1992). The same is true here. Not being in furtherance of the scheme to defraud, this communication cannot count as a predicate act.

But let us assume that the sending of the agreement was an act in furtherance of a scheme. The problem is that the Complaint does not say how Mr. Musburger "sent" the agreement. This is a problem with three of the other communications as well. (*Complaint*, ¶¶ 29, 30, 84). Plaintiff

merely alleges that Mr. Musburger "sent" the agreement and "sent" his final bill. He might have used the United States mails, but elsewhere, it appears that he communicated with plaintiff by private courier. During the falling-out between the two, on September 10 again on September 11, 2003, Mr. Musburger sent to plaintiff and his wife, two letters *by messenger*. (*Complaint*, ¶¶ 29-30). Mr. Meier and Mr. Musburger both live in northeastern Illinois and work in downtown Chicago.

It is true that the mail fraud statute encompasses *intrastate* mailings or messages sent by "private or commercial *interstate* carrier...." 18 U.S.C. § 1341 (Emphasis supplied). *See United States v. Hasner*, 340 F.3d 1261, 1270 (11th Cir. 2003); *United States v. Gil*, 297 F.3d 93, 100 (2nd Cir. 2002). But an allegation that a message was "sent" between two people in the same city, without detail as to how it was sent, does not indicate that the mails or an interstate, as opposed to a local, courier was used and thus fails under the requirement that a complaint must allege with particularity the method by which the communication was transmitted. *Slaney*, 244 F.3d at 599. These are matters of which the plaintiff would have knowledge, and had there been mailings one could have expected that allegation to have been in the Complaint. *Compare Muhammad v. Oliver*, __F.3d__, 2008 WL 4831758 at *2 (7th Cir.2008)("The excruciatingly long complaint contains 322 paragraphs; if there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening.").

The other allegation that the defendants "sent" something involves a draft of the "unified front agreement" that was sent to Mr. Meier's co-host's agent in New York City. (*Complaint*, ¶¶ 15, 18). While the method of transmission is not alleged, it may be assumed that either the mails or an interstate courier was involved. But this allegation is made on information and belief, which is insufficient. *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992)("allegations made

upon information and belief are insufficient, even if the facts are inaccessible to the plaintiff, unless the plaintiff states the grounds for his suspicions, something [plaintiff] has not done."). *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 684 (7th Cir 1992). Moreover, the unified front approach was agreed to by Mr. Meier and thus a letter to that effect could not be in furtherance of the scheme to defraud, which posits a breach of that negotiation strategy.

In sum, of the five instances of use of the mails plaintiff has attempted to allege, none are pled with the requisite particularity, and two are not in furtherance of the alleged scheme.

Allegations that might be interpreted as wirings in furtherance of some scheme are similarly sparse. The Complaint alleges that defendants made four telephone calls to the agent of plaintiff's co-host (*Complaint*, ¶¶ 37-38, 40) and alludes to a voicemail from defendant to plaintiff and an email defendants sent to plaintiff. (*Id.*, ¶¶ 34, 48).[11] The paragraphs regarding the phone calls give no hint as to what their content might have been, and consequently they fail under the applicable pleading standard that requires that a plaintiff must allege with particularity the content of the mailing or misrepresentation. *Slaney*, 244 F.3d at 599; *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir.1991). Without this particularity, it cannot be ascertained whether the communication was in furtherance of the alleged scheme to defraud. Moreover, even these calls are only pled "on information and belief," which is "insufficient." *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992).

As for the references to the voicemail and the email, there is little to be learned about them

---

[11] The imprecision and internal inconsistency of many of plaintiff's allegations make it difficult to pinpoint his claims for mail and wire fraud. For example, there is one additional mention of a phone call, but it is most likely an allegation of an in-person meeting: "That, on information and belief, phone conversations maintained by On [sic] September 18, 2003, MUSBERGER [sic] and his son, BRIAN, met with Zemira Jones and Mike Packer at Sears Tower." (Complaint, ¶ 41).

from the Complaint. They are not so much allegations as references within allegations. The voicemail is mentioned in a three-page quote of one of plaintiff's letters to the defendants: "That same morning you called me and left a message that you would use the 'old agreement between us.'" (*Complaint*, ¶ 34). The email is mentioned in a three-page quote of one of the plaintiff's letters to the defendants. There, the plaintiff writes: "I've read your email from Friday advising that you were looking forward to our meeting Tuesday morning." (*Complaint*, ¶ 48). So the content of the two is at least indicated, and one might determine the date of the communications with some effort.

But the parties were all in the Chicago area. Wire fraud must involve *interstate* communications. *Arenson v. Whitehall Convalescent and Nursing Home, Inc.*, 880 F.Supp. 1202, 1212 (N.D.Ill.1995); *Harris Trust and Savings Bank v. Ellis*, 609 F.Supp. 1118, 1122 (N.D.Ill. 1985), *aff'd.*, 810 F.2d 700 (7th Cir.1987) ("The amended complaint fails to allege any use of interstate wires, and given the Illinois residence of all the parties it would not be reasonable to infer that any such use occurred."); *Smith v. Ayres*, 845 F.2d 1360, 1366 (5th Cir. 1988)("As several courts have recognized, the statute requires that the wire communication cross state lines."); *Hernandez v. Ballesteros*, 333 F.Supp.2d 6, 12 (D.Puerto Rico 2004)(essential element of interstate communication not present where all communications occurred within Puerto Rico), *aff'd* 449 F.3d 240 (1st Cir. 2006), *cert. denied*, 127 S.Ct. 964 (2007); *DeFazio v. Wallis*, 500 F.Supp.2d 197, 204 (E.D.N.Y. 2007)("Where all parties are New York residents, all telephone calls are presumed to be intrastate and, absent any indication otherwise, the predicate act of wire fraud is not stated."); *Center Cadillac, Inc. v. Bank Leumi Trust Co. of New York*, 808 F.Supp. 213, 227 (S.D.N.Y. 1992), *aff'd* 99 F.3d 401 ("Wire fraud requires the . . . element of a communication crossing state lines.").

In sum, plaintiff has not adequately alleged a single instance of wire fraud. Coupling that

with his failures regarding the mail fraud allegations, there are not a sufficient number of predicate

acts to support his RICO claims.[12]

**b.**
**The Money Laundering Allegation**

We come then to the Complaint's allegation of money laundering. Perhaps allegation is an

inappropriate designation since there is nothing more than a citation to the applicable statute in

paragraph 135 of the Complaint, which appears to be pled on double information and belief:

> "on information and belief, as is set forth more fully above, on information and belief, Defendants and their coconspirators conspired to conduct and/or to participate directly in the conduct of the affairs of the [sic] through a pattern of racketeering activity Defendants illegal and criminal activities constituted a Pattern of Racketeering activity and conspiracy involving violations of 1956(a)(1)(B)(ii) and 18 U.S.C. §1956(a)(1)(A)(I), and acts chargeable under any of the above mentioned statutes with the intent to promote the carrying on of specified unlawful activity all in violation of RICO."

> Section 1956(a)(1) provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

> (A)(I) with intent to promote the carrying on of specified unlawful activity. . .
> (B) knowing that the transaction is designed in whole or in part –
> (ii) to avoid a transaction reporting requirement under State or Federal law.

By alleging that the money laundering was accomplished "as set forth more fully above,"

¶135 leaves it to the reader to divine from its prolix paragraphs exactly what the money laundering

consisted of. Although the non-registration issue is mentioned in various parts of the Complaint *See*

---

[12] Although plaintiff's complaint does not *specifically* allege that the defendants' call to his co-host's representative were interstate communications, it can be discerned from the complaint. Twenty-five paragraphs earlier, plaintiff alleges that the agent is based in New York City. (*Complaint*, ¶ 15).

Complaint (*see e.g.,* ¶¶ 6-8, 71-78 and 161-167), it is not until the brief in opposition to the motion

to dismiss that it becomes clear that the RICO count is based on the defendants' having laundered

the commissions paid by Mr. Meier under his 1998 contract with Mr. Musburger (*Complaint* ¶¶

9,12,71) and which were obtained as a consequence of the defendants' unlawful failure to have

registered as an employment agency under the Illinois Private Employment Agency Act.

(*Memorandum in Opposition to Motion to Dismiss,* at 23-24). [13]

But the money laundering statute explains that the phrase "knowing that the property

involved in a financial transaction represents the proceeds of some form of unlawful activity" means:

> that the person knew the property involved in the transaction represented proceeds
> from some form, though not necessarily which form, of activity that constitutes a
> *felony* under State, Federal, or foreign law, regardless of whether or not such activity
> is specified in paragraph (7); . . . .

18 U.S.C.A. § 1956(c)(1) (Emphasis supplied).

But the rub is that under the PEAA, the failure to register is not a felony, but a Class B

misdemeanor, 225 ILCS § 515/1, and thus is not "unlawful activity" under the federal money

laundering statute, thereby precluding it from qualifying it as "racketeering activity" under §1961(B)

and dooming the plaintiff's money laundering theory, which underlies Counts I and II. (Count I, ¶

135; Count II, which incorporates by reference ¶135). *See Santos v. United States,* 461 F.3d 886,

---

[13] The Complaint charges that the activities that generated this income were those of an employment agency. (¶¶ 162-165). If the Complaint only charged that Mr. Musburger was Mr. Meier's lawyer and that he negotiated and drafted Mr. Meier's contract with WLS – and it clearly does that (¶¶8-14)– the employment agency theory central to the RICO counts would not be sustainable. For the Act defines "employment agency" as: [a]ny person engaged for gain or profit in the business of securing or attempting to secure employment for persons seeking employment or employees." 225 ILCS 515/11. But the Complaint also alleges that the defendants were in the business of procuring employment for Mr. Meier and others–including one of Mr. Meier's named competitors--and that they regularly held themselves out as a talent and employment procurement agency. (¶¶ 8-9, 64-72). *Cf. Michael David Associates, Inc. v. GTE Network Systems, Inc.,* 182 Ill.App.3d 87, 90, 537 N.E.2d 945, 948 (1st Dist. 1989)("'an employment agency's business is to put a prospective employee in touch with a prospective employer....'").

37

889 (7th Cir. 2006)(elements of money laundering are knowingly conducting or attempting to conduct a financial transaction involving the proceeds of unlawful activity, knowing that the property involved in the transaction represented illegal proceeds, and engaging in the transaction with the intent to promote the carrying on of the unlawful activity).

5.

**The Use Of The Name, "The Law Offices Of Todd W. Musburger, Ltd."**

Finally, there is the claim that Mr. Musburger's use of the name, "The Law Offices of Todd W. Musburger, Ltd.," was part of a scheme to defraud because the name was not registered with the Illinois Supreme Court pursuant to Supreme Court Rule 721 and was not registered as an assumed name. The same argument appears to be made with regard to Todd W. Musburger, Ltd., the corporation , which was duly incorporated and in good standing under Illinois law. The Complaint devotes at least 26 paragraphs to this desultory contention. (*Complaint*, ¶¶ 5, 108-132).

Rule 721 does not have as its primary purpose the protection of the public safety, but rather is designed to permit duly licensed lawyers the business option of organizing in professional service corporations as a means of providing them with limited liability. The Rule requires registration as a precondition to the practice of law in Illinois by a professional corporation and other enumerated entities. The Rule lacks civil or criminal penalties for noncompliance, and any violation by the entity is a basis for discipline or suspension. Violation of the rule is *not* a basis to avoid payment of legal fees, and the violator is not practicing law without a license. *Ford Motor Credit Co. v. Sperry,* 214 Ill.2d 371, 383, 827 N.E.2d 422, 429-432 (2005).

In the context of this case, Mr. Meier could not have been confused or misled about the identity of his lawyer, with whom he had had continuous and harmonious relations since at least

1998. There is no allegation in the complaint that Mr. Meier was somehow gulled into dealing with Mr. Musburger because he used the name, The Law Offices of Todd W. Musburger Ltd., or that its use gave Mr. Musburger some advantage he would not have enjoyed. Phrased differently, the utilization of the name, "The Law Offices Of Todd W. Musburger, Ltd." and the failure to comply with Rule 721 were not material, and to be actionable under RICO, any misrepresentation or omission must be material and made with the specific intent to cheat. *Corley*, 388 F.3d at 1005. Without such an intent there can be no mail fraud. *Richards*, 55 F.3d at 252.

Nor was there a violation of the Illinois Assumed Business Name Act. The Act only requires registration of an assumed name if a person transacts or intends to transact business under a name "other than the real name or names of the individual or individuals conducting or transacting such business...." 805 ILCS 405/1. (*Complaint*, ¶ 122). Mr. Musburger *was* using his real name. The addition of the words "the law offices of" to that name is analytically meaningless. In any event, violations of the Illinois Business Corporation Act are, at worst, Class C misdemeanors. 805 ILCS §§5/16.05-16.10. The Illinois Attorney Registration and Disciplinary Commission handles violations of the Illinois Supreme Court Rules governing the practice of law, Ill.Sup.Ct.R. 751(a), and the range of discipline for the unauthorized practice of law does not include felony convictions. Ill.Sup.Ct.R.756(g)(contempt of court); 770 (reprimand to disbarment). Moreover, a non-attorney practicing law would be subject to civil liability. 705 ILCS 205/1(equitable relief, fine for civil contempt, actual damages); *Francorp, Inc. v. Siebert*, 210 F.Supp.2d 961, 970 (N.D.Ill. 2001); *Torres v. Fiol*, 110 Ill.App.3d 9, 65 Ill.Dec. 786, 441 N.E.2d 1300 (1982). Like the failure to register under the Private Employment Agency Act, these activities not being felonies cannot support the plaintiff's money laundering allegation, on which the RICO counts are bottomed.

**6.**
**Other Deficiencies In Count I**

Count I impermissibly charges Todd W. Musburger, Ltd. as a defendant and as the enterprise, the affairs of which Mr. Musburger and his son conducted through a pattern of racketeering activity. Yet, RICO requires that the person conducting or participating in the conduct of the affairs of an enterprise be distinct from the enterprise itself. (Todd W. Musburger, Ltd.). *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 160 (2001). If the Complaint was intended to charge an associated-in-fact enterprise, it contains no allegations regarding any organizational structure. *Stachon v. United Consumers Club, Inc.*, 261 F3d 673, 675 (7Th Cir. 2000).[14]

Count I also insufficiently charges Brian Musburger as having conducted the affairs of Todd W. Musburger, Ltd. through a pattern of racketeering activity. To conduct or participate in the conduct of an enterprise's affairs through a pattern of racketeering activity requires "'some degree of direction,'" so that a person charged to have conducted or participated in the enterprise's affairs within the meaning of §1962(c) must have had some part in directing those affairs. Mere participation in the activities of the enterprise is insufficient. *United States v. Cummings*, 395 F.3d 392, 397 (7th Cir. 2005). All the complaint charges is that defendant, Brian Musburger, is Todd Musburger's son who is "affiliated and associated" with "Musburger," whom the Complaint defines as Mr. Musburger. *Id.* at ¶¶ 6-8. But even if the complaint be construed as alleging that Brian Musburger is affiliated with the enterprise, Todd W. Musburger, Ltd., it charges at best mere affiliation or participation, and that is not enough under §1962(c).

---

[14] Apparently the plaintiff also intends to charge "The Law Offices of Todd W. Musburger Ltd." as an enterprise. *See* Brief in Opposition To Motion to Dismiss at 24. But that plainly is wrong since, as the Complaint says over and over, it was not a legal entity, and there are no allegations that support a claim that it is a group of individuals associated in fact although not a legal entity.

Finally, since the information that the defendants were not registered under the Illinois Private Employment Agency Act was publicly available, (*Complaint*, ¶6), the defendants' nondisclosure of that fact would not qualify as a scheme to defraud under §1341.[15]

## C.
### Count II Fails To State A Claim For RICO Conspiracy

Count II, which purports to charge the defendants with having conspired to violate §§ 1962 (b) and (c) of RICO, in violation of §1962(d), incorporates by reference the first 138 counts of the complaint, and alleges, "on information and belief," that the "forgoing [sic] acts were a product of [the defendants'] tacit and/or overt express and/or implied agreement, combination and conspiracy as aforesaid to plan, further and/or accomplish said endeavors that, if and/or when completed would violate the RICO Act to plaintiff's detriment and damage as aforesaid." (*Complaint*, ¶ 139).

To plead an actionable conspiracy to violate § 1962(c), a plaintiff relying on mail or wire fraud as the predicate acts must allege an agreement by the defendants to conduct or participate in the affairs of an enterprise and that someone commit at least two acts consisting of use of the mails or wires that further the scheme to defraud. *United States v. Cummings*, 395 F.3d 392, 397-98 (7th Cir. 2005). "A person may not bring suit under §1964(c) predicated on a violation of §1962(d) for injuries caused by an overt act that is not an act of racketeering or otherwise unlawful under the statute." *Beck v. Prupis*, 529 U.S. 494, 499, 505 (2000); *Bridge v. Phoenix Bond & Indemnity Co.*,

---

[15] *See United States v. Brown*, 79 F.3d 1550, 1559 (11th Cir.1996) (holding there is no mail fraud for failure to disclose investment potential or re-sale value of real estate when essential pricing information can be obtained); *Blount Fin. Servs. v. Walter E. Heller & Co.*, 819 F.2d 151, 153 (6th Cir.1987(holding there is no RICO claim when alleged misrepresentation could have been checked against public information). *See also In re Mexico Money Transfer Litigation*, 2000 WL 1889666 (N.D.Ill. 2000); *Cardenas v. RIA Telecommunications, Inc.*, 2001 WL 536043 at *4 (N.D.Ill.,2001).

_U.S._, 128 S.Ct. 2131, 2138, 2140 (2008); *Sedima*, 473 U.S. at 497; *Saro v. Brown*, 11 Fed. Appx. 387 (6th Cir. 2001). Count II is deficient and must be dismissed

The cases are uniform in holding that failure to make out a substantive RICO claim requires dismissal of a conspiracy claim based on the same nucleus of operative fact. *See e.g. Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 469, 476 (7th Cir. 2007)(because there was no pattern, district court was correct to dismiss all RICO claims, including 1962(d)); *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 677 (7th Cir. 2000)("Since Appellants fail to establish a violation of section 1962(c), their section 1962(d) claim based on the same facts must fail as well."); *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1026 (7th Cir. 1992)(no need to address dismissal of conspiracy claim where it was "also premised on the existence of a pattern of racketeering . . ." and there was no pattern); *J.D. Marshall Intern., Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir. 1991)("[The pattern requirement] is this single element that rings the death knell of the RICO counts in [the] proposed second amended complaint."); *Magnum v. Archdiocese of Philadelphia*, 253 Fed. Appx. 224 (3d Cir. 2007); *(Maersk, Inc. v. Neewra, Inc.*, 554 F.Supp.2d 424, 462 (S.D.N.Y. 2008); *Tate v. Pacific Gas & Elec. Co.*, 230 F.Supp.2d 1072, 1084 (N.D.Cal. 2002).

The reason for this rule is obvious: A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense under § 1962(a), (b), or (c). *Salinas v. United States*, 522 U.S. 52, 65 (1997); *Salinas, Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 964 (7th Cir.2000) Since a pattern of racketeering activity is RICO's key requirement, *H.J., Inc.*, 492 U.S. at 241-42, an agreement to commit acts that do not constitute a

pattern cannot be an agreement to violate RICO.[16]

Moreover, as in *Lachmund v. ADM Investor Services, Inc.*,191 F.3d 777 (7th Cir.1999), "nothing in [Count II] ... pleads any facts indicating an act of agreement among the alleged conspirators or what roles the various defendants would play in the conspiracy. The complaint also lacks any specific allegation that the defendants agreed to the commission (by someone) of two specific predicate acts in furtherance of the alleged conspiracy. Absent such particular pleadings, Mr. [Meier's] complaint contains nothing more than 'conclusory, vague and general allegations of a conspiracy' that are insufficient to state a claim under §1962(d)." *Id.* at 785 (footnotes omitted)(parenthesis in original). *See also Goren*, 156 F.3d at 733("a complaint may be dismissed if it contains only conclusory, vague, and general allegations of a conspiracy.").

Finally, the Complaint affirmatively shows that Mr. Meier has no standing under §1964(c) to maintain Count II. The "injury to business or property" consists of the commissions paid by Mr. Meier under the 1998 contract, *supra* at 37. Those payments resulted not from any racketeering activity, as 1964(c) requires, *RWB Services, LLC v. Hartford Computer Group, Inc.*, 593 F.3d 681, 686 (7th Cir. 2008), but from Mr. Musburger's non-registration as an employment agency. But that is not an act of racketeering activity as defined in 1961(1) and thus does not qualify under RICO.

## D.
### There Being No Federal Jurisdiction Over The Complaint, Abstention Does Not Come Into Play

Once plaintiff's RICO claims – the sole premise of federal jurisdiction here – are dismissed,

---

[16] The Supreme Court in *Beck,* 529 U.S. at 506, noted that its opinion "d[id] not resolve whether a plaintiff suing under §1964(c) for a RICO conspiracy must allege an actionable violation under §§1962(a)-(c), or whether it is sufficient for the plaintiff to allege an agreement to complete a substantive violation and the commission of at least one act of racketeering that caused him injury.

there remain sixteen counts of state law causes of action, all bottomed on the same nucleus of operative fact as are the RICO claims in Counts I and II. But, where "the sole basis for invoking federal jurisdiction is nonexistent... the federal courts should not exercise supplemental jurisdiction over his remaining state law claims." *Aztar Ind. Gaming*, 351 F.3d at 300. "To hold otherwise would suggest to every nondiverse plaintiff that he or she may invoke federal jurisdiction simply by alleging a baseless RICO claim, which would have the effect of denying or diminishing access to the federal courts by other litigants legitimately invoking federal jurisdiction." *Id.* Consequently, plaintiff's motion to abstain from exercising jurisdiction is denied, because there is no federal jurisdiction over the RICO claims in the first place. Even if the exercise of supplemental jurisdiction under 28 U.S.C. §1367 were a matter of discretion, the state law counts should also be dismissed.[17]

## CONCLUSION

Long before *Bell Atlantic v. Twombly*, the Supreme Court had warned against permitting a plaintiff "'with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence.'" *Limestone Development Corp.*, 520 F.3d at 803 (citation omitted). This is such a case. At its most basic level it is a garden variety, breach of fiduciary duty case. Indeed, the Complaint alleges in words or substance breach of fiduciary duty more than 30 times. Nonetheless, the plaintiff has labored to transform his narrow dispute with his former lawyer into RICO violations through tendentious pleading. But "'[a]dding more warts to the hog still does not make it a dragon.'" *J.D. Marshall*

---

[17] If dismissal were based on the mere failure to plead mail and wire fraud with particularity, the plaintiff would be entitled to amend the Complaint. *See Emery*, 71 F.3d at 1348. But, since the deficiencies in the Complaint go far beyond mere technicalities or amendable errors, dismissal of the case is appropriate.

*Intern., Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991). It is well to recall the Seventh Circuit's admonition "[n]ot all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud.'" *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989). *See also McDonald*, 18 F.3d at 495, n.3; *Corley*, 388 F.3d at 1008.

RICO was not intended by Congress to establish a code of business or professional ethics, the breach of which permits suit in federal court for treble damages and attorneys' fees. Congress's concern was with long-term, pervasive criminality – the antithesis of the situation in this case. What the court said in *Jennings*, applies with equal force here: "Even if the defendants may have used misleading tactics in their [dealings with Mr. Meier] (a point on which we take no position) the case lacks any of the hallmarks of a RICO violation. There is no pattern of fraudulent or racketeering behavior. The state courts... have ample tools to correct any individual instances of fraud or other misconduct." 495 F.3d at 473 (parenthesis in original).

The defendants' Motion to Dismiss is GRANTED, and the case is dismissed with prejudice since any attempt to again amend the complaint would be futile. The defendants' motion for an award of attorneys' fees cannot be decided since the briefing on that issue is not sufficiently developed. The defendants shall have 21 days from the date of this order to file an appropriate brief in support of their request for fees. The plaintiff shall have 21 days to respond. The defendants shall have 7 days to reply.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 12/5/08

45